UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
BOSTON DIVISION
**************************************

MYRON D. WINKELMAN
and STEPHANI MARTINSEN (formerly LeFlore),
as Relators for the
UNITED STATES OF AMERICA,                    **Civil Case No.: 11 CA 11 398**
STATE OF CALIFORNIA,
STATE OF COLORADO,
STATE OF CONNECTICUT,
STATE OF DELAWARE,
DISTRICT OF COLUMBIA,                         **FILED <u>IN CAMERA</u> AND**
STATE OF FLORIDA                              **<u>UNDER SEAL</u>**
STATE OF GEORGIA                              **PURSUANT TO THE**
STATE OF HAWAII,                              **FEDERAL FALSE CLAIMS ACT**
STATE OF ILLINOIS,                            **31 U.S.C. 3730(b)(2)**
STATE OF INDIANA,
STATE OF LOUISIANA,
STATE OF MARYLAND,                            **JURY TRIAL DEMANDED**
COMMONWEALTH OF MASSACHUSETTS,
STATE OF MICHIGAN,
STATE OF MINNESOTA,
STATE OF MONTANA,                             **AMENDED**
STATE OF NEW JERSEY,                          **COMPLAINT**
STATE OF NEW MEXICO,
STATE OF NEW YORK,
STATE OF NEVADA,
STATE OF NORTH CAROLINA,
STATE OF OKLAHOMA,
STATE OF RHODE ISLAND,
STATE OF TENNESSEE,
STATE OF TEXAS,
COMMONWEALTH OF VIRGINIA, and the
STATE OF WISCONSIN,

          Plaintiffs,

vs.

CVS CAREMARK CORPORATION;
CVS Pharmacy, Inc.,
SILVERSCRIPT, LLC;
CAREMARK, Rx LLC
(f/k/a CAREMARK Rx, INC.);
CAREMARK, LLC

1

(f/k/a CAREMARK, INC.);
CAREMARK PCS, LLC;
SILVERSCRIPT INSURANCE COMPANY;
and ACCENDO INSURANCE COMPANY,

              Defendants.
************************************

# AMENDED COMPLAINT
## INDEX

| | | Page |
|---|---|---|
| I. | Introduction............................................................. | 5 |
| II. | Jurisdiction and Venue.............................................. | 6 |
| III. | Parties..................................................................... | 7 |
| IV. | Medicaid Best Price Laws......................................... | 9 |
| V. | Tricare and Other Federal Payor Programs.................... | 12 |
| VI. | Recent History of Drug Discount Programs For Cash Customers............ | 13 |
| VII. | Relator Winkelman's Discovery of the Fraud.................... | 14 |
| VIII. | Relator Martinsen's Discovery of the Fraud.................... | 17 |
| IX. | Tricare Overbilling Samples....................................... | 21 |
| X. | The Medicare Part D System....................................... | 22 |
| XI. | CVS Caremark Entities in Medicare Part D Program.............. | 37 |
| XII. | CVS Caremark Revenues Related to Medicare Part D Services................. | 42 |
| XIII. | Particularity of Defendants Illegal Overbilling on Medicare Part D Claims........ | 43 |
| XIV. | Violation of December 10, 2007 Corporate Integrity Agreement.............. | 49 |
| Count I | Violations of Federal False Claims Act ............................. Medicaid, Tricare and Other Federal Programs | 53 |
| Count II | Violations Of The False Claims Act .................................. Medicare Part D Program | 54 |

Count III         California False Claims Act.................................................    57

Count IV          Colorado Medical False Claims Act.....................................    58

Count V           Connecticut Medicaid Fraud False Claims Act..........................    59

Count VI          Delaware False Claims and Reporting Act..............................    59

Count VII         District of Columbia Procurement Reform Amendment Act............    60

Count VIII        Florida False Claims Act....................................................    61

Count IX          Georgia State False Medicaid Claims Act...............................    61

Count X           Hawaii False Claims Act....................................................    62

Count XI          Illinois Whistleblower Reward and Protection Act.....................    63

Count XII         Indiana State False Claims and Whistleblowers Protection Act......    63

Count XIII        Louisiana Medical Assistance Programs Integrity Law...............    64

Count XIV         Maryland False Health Claims Act of 2010.............................    65

Count XV          Massachusetts False Claims Act...........................................    65

Count XVI         Michigan Medicaid False Claims Act.....................................    66

Count XVII        Minnesota False Claims Act................................................    67

Count XVIII       Montana False Claims Act..................................................    67

Count XIX         New Jersey False Claims Act...............................................    68

Count XX          New Mexico Medicaid False Claims Act.................................    69

Count XXI         New York False Claims Act.................................................    69

Count XXII        Nevada False Claims Act....................................................    70

Count XXIII       North Carolina False Claims Act...........................................    71

Count XXIV        Oklahoma Medicaid False Claims Act....................................    71

Count XXV         Rhode Island False Claims Act.............................................    72

3

Count XXVI   Tennessee Medicaid False Claims Act.................................... 73
    Tenn. Code. Ann. §71-5-181 to -185

COUNT XXVII  Tennessee False Claims Act.......................................... 73
    Tenn. Code. Ann. §4-18-101 et seq.

Count XXVIII  Texas Medicaid False Claims Act..................................... 74

Count XXIX   Virginia Fraud Against Taxpayers Act................................... 75

Count XXX  Wisconsin False Claims for Medical Assistance.......................... 75

Prayer for Relief................................................................. 76

Jury Demand..................................................................... 76

## I.    INTRODUCTION

1.    This is a False Claims Act case brought under the Federal False Claims Act, 31U.S.C.§3729, et. seq., and the false claims acts of the plaintiff states. It is brought by plaintiffs and relators Myron D. Winkelman and Stephani Martinsen, through their undersigned attorneys, on behalf of the United States of America (or the federal Government), the states of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Maryland, Michigan, Minnesota, Montana, New Jersey, New Mexico, New York, Nevada, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas and Wisconsin, the Commonwealths of Massachusetts and Virginia, and the District of Columbia (collectively "the states.")

2.    This case involves illegal overbilling by defendant CVS to the federal government and states in Medicaid (Medical Assistance) programs, and to the federal government in the Medicare Part D program, the Veterans Administration, the Champus-Tricare and Champva Military related programs, the United States Military Healthcare facilities, the Indian Health Service facilities and the federal health benefit program. Beginning sometime in 2008, CVS began a successful marketing campaign to lure customers without prescription insurance, offering them deep discounts for a large variety of generic drugs. These inexpensive, discounted prices established the "Usual and Customary" prices for these generic prescription drugs. Federal health care laws for Medicaid and the Medicaid Pharmacy billing laws of the plaintiff state governments mandated that the governments were not to be charged more than the "Usual and Customary" prices for these drugs. Despite these laws, defendant CVS, knowingly charged the plaintiff governments substantially more for

these generic prescription drugs in the Medicaid programs, thereby wrongfully overcharging the plaintiff governments in violation of the false claims acts.

## II.   <u>JURISDICTION AND VENUE</u>

3.   This is a civil action arising under the laws of the United States to redress violations of the False Claims Act, 31 U.S.C. §§3729 et seq. This court has jurisdiction over the subject matter of this action: (i) pursuant to 31 U.S.C. §3732, which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§3729 and 3730; and (ii) pursuant to 28 U.S.C. §1331, which confers federal subject matter jurisdiction; and (iii) pursuant to U.S.C. §1345, because the United States is a plaintiff.

4.   This suit is not based upon prior public disclosures of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit or investigation or in a Government Accounting Office or Auditor General's report, hearing, audit or investigation, or from the news media.

5.   To the extent that there has been a public disclosure unknown to Relators, Relators are original sources under 31 U.S.C. §3730(e)(4), and the other government false claims statutes. They have direct and independent knowledge of the information on which the allegations are based and have voluntarily provided the information to the government before filing this *qui tam* action, in 2011.

6.   Relators are concurrently providing to the Attorney General of the United States, to the United States Attorney for the District of Massachusetts, and to the appropriate attorney for the other government plaintiffs, a statement summarizing known material evidence and information related to this Complaint, in accordance with the provisions of 31

U.S.C. §3730(b)(2) and the similar provisions of the other government false claims acts. This disclosure statement is supported by material evidence.

7. ·     This court has jurisdiction over defendant under 31 U.S.C. §3732(a) because defendant can be found in, is authorized to transact business in, and is now transacting business in the District of Massachusetts. In addition, acts proscribed by 31 U.S.C. §3729 have occurred in this District.

8.     Venue is proper in the District of Massachusetts under 31 U.S.C. §3732(a) and 28 U.S.C. §1391, because CVS conducts business in this District and, upon information and belief, the acts giving rise to this action occurred within the District.

9.     This Court has supplemental jurisdiction over the false claims act claims of the other plaintiff governments pursuant to 28 U.S.C. §1367. This federal court jurisdiction over state law false claims is further authorized by 31 U.S.C. §3732(b).

III.    **PARTIES**

10.     Defendant CVS Caremark Co. (hereinafter referred to as "CVS"), is a nationwide retail pharmacy corporation headquartered in Woonsocket, Rhode Island. The acronym CVS stands for "Consumer Value Stores" and the corporation has been in the retail pharmacy business since 1963. On its website, CVS boasts annual sales of $99 billion and was ranked 18th in the Fortune 500 for 2010. In the past, it has settled at least two False Claim Act lawsuits alleging Medicaid fraud, and paid millions of dollars to settle those cases. CVS has at least 7,152 retail pharmacy stores in 42 states, the District of Columbia and Puerto Rico. Defendant CVS Caremark is the self-proclaimed "largest provider of prescriptions in the country." The defendant subsidiaries of the parent corporation defendant CVS Caremark Corporation we describe later in this Amended Complaint.

11.     Plaintiff and Relator Stephani Martinsen (formerly Stephani LeFlore) is a licensed pharmacist currently working for CVS Caremark as a CVS Caremark retail pharmacy in Minnesota. Ms. Martinsen previously held positions as a pharmacy manager for Walgreen Corporation and as a staff pharmacist for Merwin Long Term Care pharmacy, both in Minnesota. Ms. Martinsen graduated from the University of Minnesota College of Pharmacy and has been a licensed pharmacist in Minnesota since 1999.

12.     Relator Myron D. Winkelman is a registered pharmacist with a long, successful career.  He was, for many years, a chain drug store senior executive, with responsibilities in purchasing, insurance programs, operations and government affairs.  Then, after several years in the pharmacy computer business, he became the senior operations officer for ValueRx, a large PBM that was subsequently acquired by Express Scripts.  While at ValueRx, he built and managed the provider network, established and maintained their generic pricing program, reworked their processing systems, and ran their mail order operation.

13.     Relator Winkelman established Winkelman Management Consulting (WMC) nearly twenty years ago, after leaving ValueRx.  Mr. Winkelman has a Bachelor of Science degree in pharmacy from Wayne State University and is the former Chair of the National Association of Chain Drug Stores [NACDS] Task Force on National Health Insurance. He was also a member of the Board of Directors of PCMA, the trade organization for the PBM and mail order Pharmacy industry.

14.     Relator Myron D. Winkelman is currently President of Winkelman Management Consulting, Inc.. He is a widely recognized expert on pharmacy and pharmacy benefit issues.  WMC clients include a number of state governments, for both Medicaid and

8

employee benefits agencies.  On their behalf he has managed a number of multi-state 'bulk-purchasing' initiatives, yielding millions of dollars in savings.

15.     Mr. Winkelman also acts as an advisor to larger health care consulting firms and trade associations on pharmacy management issues. WMC consults for the HHS Office of Inspector General on pharmacy billing fraud.  He has a deep understanding of the complexities of pharmacy benefits, and the techniques used by PBMs to maximize their profits.

## IV.     MEDICAID BEST PRICE LAWS

16.     When reimbursing for drugs, the federal-state Medicaid program mandates that the Medicaid program shall pay the lower of (1) the estimated acquisition cost (EAC) of covered drugs, plus a reasonable dispensing fee, or (2) a provider's usual and customary (U&C) charges to the general public. 42 C.F.R. §447.301.

17.     While the specific reimbursement formulas vary from state to state, the state Medicaid programs reimburse pharmacy providers for each drug based on the lowest of (a) the EAC as set by the states, (b) the Maximum Allowable Cost (MAC) set by the State Medicaid agency or (c) the provider's usual and customary charge. For generics (a/k/a "multiple source drugs") subject to a Federal Upper Limit (FUL), state Medicaid agencies must not pay more than those limits. 42 C.F.R§§447.331, 447.332 and 447.333(2005).

18.     Defendant CVS Caremark, as a retail pharmacy selling drugs to Medicaid customers, has entered into Medicaid provider agreements with State Medicaid agencies in which it has agreed to comply with all Medicaid State and Federal laws. Entering into these agreements and obedience thereto are conditions to payment of claims for drugs. Attached are

samples of such provider agreements for the states of Florida (Exhibit 15) and Minnesota (Exhibit 16).

19.     Submission of claims by pharmacy providers such as CVS to the Medicaid Agencies are made electronically, in real time.   Protocols for this transmission have been created by an ad hoc standards organization called the National Council for Prescription Drug Programs, Inc. (NCPDP).   Each claim is a separate transaction. The NCPDP standard specifies the information that must be transmitted and in which fields the data must be entered. This is accomplished by the computer software in the pharmacy as the information is entered or calculated.   When the claim is so submitted, the Medicaid Agency receives the claim, and in a few seconds either accepts or rejects it.  If the claim is accepted, the Medicaid agency transmits a message back to the pharmacy that acknowledges the acceptance of the claim, assigns it a unique reference number and processes it for payment in the next cycle – usually in a few weeks. These protocols have been in place for decades, and are occasionally updated. The pharmacy's Usual and Customary price is a mandated datum. It is entered into the computer system in the pharmacy, is included in the claim submission, and is considered by the Medicaid Agency's computer system in calculating the proper reimbursement.

20.     State Medicaid rules also mandate that pharmacies charge Medicaid no more than the usual and customary prices. For example, Texas Administrative Code section 355.8541 (1) mandates that Medicaid in Texas (administered by the Texas Health and Human Services Commission [HHSC]), will reimburse pharmacies for the **lesser** of HHSC'S best estimate of acquisition costs (EAC) plus HHSC's currently established dispensing fee for prescriptions, or (2) the usual and customary price charged the general public. Furthermore, Texas administrative code section 355.8544 on "Usual and Customary Prices," specifies that

Medicaid customers cannot be denied the true usual and customary lowest price by the manner that pharmacies have the customer "paying for the prescription by a particular method."

21.   The Texas Medicaid program defines usual and customary prices as follows:

Rule §355.8544 Usual and Customary Prices

(a) The usual and customary price is the price the provider most frequently charges the general public for the same drug. If the department cannot determine a most frequent price, the median price is used. Items that the provider must consider when determining the usual and customary price include the following:
  (1) The term general public does not include any person whose prescriptions are paid by third-party payors, including health insurers, governmental entities, and the Texas Medical Assistance (Medicaid) program.
  (2) When a discount is given (including, but not limited to, cash rebate, monetary price discount, coupon of value) or advertised for any segment of the general public, the discount must be included in the usual and customary price determination for Medicaid prescriptions of the Medicaid recipient would otherwise have qualified as a member of that same segment of the general public. Some providers give discounts to non-Medicaid customers based on requirements similar to those specified in subparagraphs (A) and (B) of this paragraph. Providers must not use the following types of requirements as reason to disqualify Medicaid recipients as members of the same segment of the general public receiving the discount:
    (A) possessing or presenting a special identification card or document, or making a verbal request for a discount;
    (B) paying for the prescription by a particular method.
(b) If a provider utilized one pricing policy for cash recipient and a different pricing policy for charge recipient, the lower of the two pricing policies is the provider's usual and customary price.

22.   Attached as Exhibit 8 is a May 16, 2008 letter of the Texas Health and Human Services Commission where it expressly warned Defendant CVS that it should be giving Medicaid the benefit of their cash discount program, which CVS patterned after the program of competitor Wal-Mart.

23.   Attached as Exhibit 14 is the March 24, 2011 letter of the Illinois Department of Healthcare and Family Services, which explains that this Medicaid agency "publishes

reimbursement policy in its Pharmacy Provider Handbook requiring pharmacy providers to bill Medicaid services at 'usual and customary' ("U&C") charges. For further clarity, HFS defines U&C charges in the Pharmacy Handbook as 'the amount a provider would charge cash customers for a prescription, exclusive of sales tax.' Should a provider U&C charges be less than the maximum allowable HFS rate for a drug, HFS reimburses at an amount equal to the provider's U&C charge amount."

## V.    TRICARE AND OTHER FEDERAL PAYOR PROGRAMS

24.    TRICARE (formerly also called CHAMPUS), administered by the United States Department of Defense, is a healthcare program for individuals, dependants and retirees affiliated with the armed forces.   CHAMPVA, administered by the United States Department of Veterans Affairs, is a healthcare program for the families of veterans with 100% service-connected disability.

25.    The Federal Employee Health Benefit Program, administered by the United States Office of Personnel and Management, provides health insurance for federal employees, retirees, and survivors.

26.    The federal government pays for the cost of the generic prescription drugs at issue in this case, at United States Military Healthcare Facilities, the Indian Health Service Facilities and to public health clinics.

27.    Defendants have sold hundreds of thousands of prescriptions for the generic drugs at issue here to the federal government through the above named healthcare programs, including veterans, the military, federal employees and Native Americans. Defendants have also caused hundreds of thousands of generic drug prescriptions to be sold through these same healthcare services that were paid for by the federal government, with the full knowledge of

defendants. The above named programs will hereinafter be referred to as "other federal payer programs."

## VI.   RECENT HISTORY OF DRUG DISCOUNT PROGRAMS FOR CASH CUSTOMERS

28.    In 2006, Wal-Mart began a discount program for cash customers who purchased prescription generic drugs. They priced these drugs at a flat $4 for thirty doses, and $9 for ninety doses. This became Wal-Mart's "Usual and Customary" (U&C) price for those medicines. Wal-Mart correctly established its billing system so that these discounted prices were transmitted as the Usual & Customary charge to Medicaid, Medicare and other government benefit programs. Defendant CVS saw the popularity of Wal-Mart's program for cash customers, and quickly reacted to meet the competition with its own cash customer discount program for generics, marketing it as the "Health Savings Pass" (HSP).

29.    However, defendant CVS knowingly crafted its HSP generic prescriptions cash discount program to deprive the federal and state governments' of the discounted prices.

30.    CVS began this HSP cash discount for prescription generics on November 9, 2008.

31.    The knowing fraud on the federal and state governments is more blatant because CVS-Caremark is not only a retail seller of generic drugs, its pharmacy benefit manager (PBM) division, Caremark, is a contracted manager of the Medicare Part D program for the federal government, and enjoys a lucrative contract administering the Federal Employees Health Plan (FEHP).

## VII.   <u>RELATOR WINKELMAN'S DISCOVERY OF THE FRAUD</u>

32.     In 2006, while conducting audits under contract for the state of Michigan, relator Winkelman observed that the usual and customary prices submitted by CVS to the government did not appear to be the prices actually charged to cash paying customers. What he first observed, as an auditor for Michigan, he also saw in Puerto Rico in 2008 through 2010 at CVS-Caremark pharmacies.

33.     After CVS began its Health Savings Pass program, relator Winkelman saw in early 2009 that the Health Savings Pass discount program at CVS had a charge of $9.99 for a ninety day supply of generic medications.

34.     Relator Winkelman has direct, hands on experience in creating computerized billing systems for retail pharmacy chains in the United States. He is aware from that personal experience, and his other professional and investigative experience in the industry, that computerized billing systems can be established by a retail chain or a PBM so that the pharmacists or technicians at the retail pharmacies can or cannot modify the amounts that the government programs are billed.

35.     Importantly, Medicaid programs almost never pay for more than a 30 day supply of medications, since Medicaid eligibility is month to month.

36.     State Medicaid agencies are generally unaware of this fraudulent overbilling scheme related to the "Usual and Customary" price on generic drugs. Their computerized billing systems and oversight programs are not designed to ferret out this U and C discrepancy fraud.

37.     While CVS obfuscates this program with, among other things, a $15 annual enrollment fee (originally a $10 enrollment fee), this nominal fee is readily paid by thousands

of individual cash customers because the deep discounts for the generics under the program easily make up the $10 or $15 enrollment fee. Defendant CVS knows full well that the federal and state government programs are not bureaucratically set up to pay an enrollment fee for their program beneficiaries. The minimal nature of the $10 or $15 enrollment fee is also substantially minimized because this same enrollment fee entitles a CVS customer to cash discounts on non-prescription goods in the CVS pharmacies.

38.     The current state Medicaid agencies also are simply not likely to have the resource to commit to properly investigate violations of the legal requirement that providers only charge Medicaid their usual and customary charge. Attached as Exhibit 14 is the March 24, 2011 letter from the Illinois Department of Healthcare and Family Services, where that Medicaid enforcement agency explains:

> **"In terms of post-payment enforcement of this reimbursement policy, HFS does not actively audit pharmacies for compliance. Illinois currently has more than 2,900 retail pharmacies participating in the Medicaid program and HFS reimburses pharmacies for more than 22 million prescription drugs annually. Due to our large claims volume, it is neither reasonable nor practicable for HFS to do post-payment price comparisons between cash customer rates and HFS charged amounts."**

In this same letter, the Illinois Medicaid agency clarifies that pharmacies are only to bill Medicaid their usual and customary charge, as mandated by its Pharmacy Provider Handbook.

39.     Attached as Exhibit 1 is the current internet offering of CVS on its Health Savings Pass (HSP) discount program. For "only $15 annually per person" the customer can pay only $11.99 for a 90 day supply of over 400 generic prescriptions. Attached as Exhibit 2 is the January, 2011 list of the generic prescriptions offered on this HSP discount program. This was the list in effect for CVS individual, cash customers during February, 2011.

40.     Attached is Exhibit 3 is a February 15, 2011 posting of the website michigandrugprices.com, provided by the Michigan agency that administers Medicaid, the Michigan Department of Community Health. This website provides: "The pricing on this website reflects the 'usual and customary' prices reported by participating pharmacies for generic Medicaid prescriptions filled during this survey period." (Underlined emphasis added.) For the generic drug Lisinopril, a five mg tablet, CVS has told the Michigan Medicaid agency that the usual and customary price for a quantity of 30 is $14.39 or $15.99. Yet Relator Winkelman saw that CVS at the same time was selling a 90 day supply of the identical 5 mg Lisinopril for $11.99 under its Health Savings Pass (HSP) program. While customers must pay a $15 annual fee to enter the Health Savings Pass program, this amount is dwarfed by the price savings on generic drugs, which is not being provided to the state and federal government Medicaid program.

41.     Exhibit 4 was taken from the michigandrugprices.com list posted on February 16, 2011, and shows that CVS pharmacy was telling the Michigan Medicaid agency that its "usual and customary" price for the Carbamazepime 200mg tablet was $20.29 for a quantity of 60. Relator Winkelman saw that at the same time CVS was offering 180 tablets of the very same generic drug for $11.99 under its HSP program. (See Exhibit 2, page 2, first column under "Mental Health" drugs.)

42.     Attached as Exhibit 5 is the michigandrugprices.com page posted on February 16, 2011, reflecting the "usual and customary" price given to the Michigan Medicaid agency by CVS pharmacy of $19.59 for a 75 dosage quantity of Albuterol 0.83mg/ml solution. Relator Winkelman saw that the same prescription was offered under the HSP for $11.99 for the same quantity. (See Exhibit 2, page 1, column 1 under Asthma drugs.)

43.     Attached as <u>Exhibit 6</u> is the michigandrugprices.com page posted on February 16, 2011 where CVS provided the Michigan Medicaid agency a "usual and customary" price for the Levothyroxine 100mcg tablet of $13.79 for 30 tablets. Relator Winkelman saw that CVS at the same time sold a 90 tablet quantity of the same thyroid generic pill for $11.99 on its HSP program (see <u>Exhibit 2</u>, page 2, column 3.)

44.     Attached as <u>Exhibit 7</u> is the "Florida Prescription Drugs Prices" webpage posted on February 17, 2011 by the Florida office of the attorney general, showing that Defendant CVS proffered its "usual and customary" price for January 1-January 31, 2011 on a 30 tablet quantity of Levothyroxine 100 mcg of $12.39, while it offered a 90 pill quantity for $11.99 under its HSP discount program. <u>Exhibit 7</u> also shows that CVS proffered a usual and customary price to the State of Florida's agency for healthcare administration of $23.09 for 30 tablets of Warfarin Sodium 10mg tablets, while it was offering 90 tablets for $11.99 under its HSP. (See <u>Exhibit 2</u>, page 2, column 1 under "Heart Health and Blood Pressure" medications.)

## VIII.   RELATOR MARTINSEN'S DISCOVERY OF THE FRAUD

45.     In her job as a pharmacist at a CVS pharmacy in Minnesota, relator Stephani Martinsen has seen numerous examples of the Medicaid programs being wrongfully overcharged for generic prescription drugs among the 400 generic medications on which defendant CVS offers the HSP discount program. Below are representative examples of the fraudulent billings in excess of the usual and customary charges.

46.     Relator Martinsen has also seen that other CVS pharmacists and technicians are not aware of Medicaid being overbilled. Furthermore, the CVS pharmacists and technicians are powerless to rectify the situation by providing beneficiaries of the Medicaid

with the lower HSP discounted prices for the generic drugs. Defendant CVS-Caremark has set up its computerized billing system so that the CVS pharmacists and technicians at the retail level can do nothing about this overbilling, even if they are aware of it.

47.     Attached as <u>Exhibit 9</u> are three generic medicine prescription scripts from the week of February 10 to February 16, 2011, from the CVS retail pharmacy #1129 in Robbinsdale, Minnesota, a suburb of Minneapolis. These were gathered by relator Martinsen. The names and private data of the customers, as well as the name of the prescribing doctor ("PRSCHR") have been redacted. Two scripts numbered 0274722 demonstrate that on February 10, 2011, a customer using the "CVS Health Savings Pass" (HSP) obtained two identical scripts for a total of 240 tablets of Glyburide, 5 mg tablet, a diabetes medication, for $31.96 (120 each at $15.98). This also demonstrates another aspect of the wrongful overpricing that CVS commits against the government. Astute customers using the CVS's HSP program can actually purchase much more than 30 or 90 tablets for the cheaper HSP price. They can actually obtain hundreds of these tablets at the discount price -- multiples of the 30 day or 90 day supply.

48.     Also on <u>Exhibit 9</u> is prescription 0280302 on the lower left for the same Glyburide 5 mg tablet. This one would have been paid for by Minnesota Medicaid at $36.05 for 120 such tablets (a 30 day supply), when a CVS Health Savings Pass Customer could get 240 tablets for $31.96. This was a simulated examplar claim run by relator Martinsen to simulate billing Medicaid. Relator Martinsen verified all of the Medicaid prices paid, or that Medicaid would have paid, by directly speaking to a Minnesota Medicaid official on their help desk or provider relations line.

18

49.     Exhibit 10 shows prescription number 0250849 from February 17, 2011 at the same CVS retail pharmacy, gathered by Relator Martinsen. It shows a CVS Health Savings Pass customer obtaining 30 Levothyroxine 88 mcg tablets for $11.99. See the upper right hand corner script on Exhibit 10. Also on Exhibit 10, just below it, relator Martinsen ran a simulated examplar script showing that a CVS Health Savings Pass customer could obtain 90 of the same Levothyroxine 88 mcg tablets for the same price of $11.99. (Prescription number 0250849.) Compare these to an actual Medicaid customer on prescription 0280301 on February 16 (upper left corner of Exhibit 10), where Medicaid paid $8.15 for 30 of these same pills. If we just compare these two 30-pill upper prescriptions, it appears that Minnesota Medicaid is actually obtaining a price less than the usual and customary of CVS under its HSP price. It is selling 30 such pills for $11.99 under the HSP and Minnesota Medicaid is paying $8.15 for the same 30 pills. However, if we compare it to prescription 0250849 on the lower right on Exhibit 10, a Health Savings Pass customer purchased 90 of the pills for only $11.99, compared to the customer on Medicaid  paying $8.15 for 30 of the same pills. The CVS Health Savings Pass customer can buy the pill at just over 13 cents each, where Minnesota Medicaid is paying over 27 cents each, more than double the price.

50.     Defendant CVS Caremark is well aware that Minnesota's Medicaid, like other state Medicaid agencies, only pays for prescriptions of 30 days maximum length. With the sophisticated, computerized pricing systems of the largest prescription provider in the country, defendant CVS Caremark is more aware than anyone else of the appearance this creates for the state Medicaid agencies. Even if Medicaid investigators were alerted to check, they could easily price what Medicaid is paying for a 30 day supply of some prescription generic medications, and see that Medicaid is sometimes paying less than the Health Savings

Pass costs for a 30 day supply. Yet the Minnesota Medicaid agency and others are being frauded because the Health Savings Pass customers are being provided 90 day, 120 day or even longer supplies of the identical pill for as little as half the cost per pill.

51.    The prescription number 0250849 on the lower right of Exhibit 10 that demonstrated a Health Savings Pass customer being able to buy 90 pills at $11.99 was actually a simulated examplar sample run performed by relator Martinsen, but it is an identical example of what can be purchased by a Health Savings Pass customer for that prescription in that amount.

52.    Another Medicaid example gathered by relator Martinsen is provided by Exhibit 11 from May 12, 2011, script 0290799, where Minnesota Medicaid paid $15.15, and the Medicaid customer paid $1, for a 30 day supply of Fexofenadine HCL 30 mg tablets. (Exhibit 11, page 1.) On the same day of May 12, 2011, another customer paid only $11.99 for a 30 day supply of the identical tablets under the CVS Health Savings Plan. (Exhibit 11, page 2, Script 290800). An even more stark overbilling is demonstrated by Script 0290800, page 3 of Exhibit 11, where a 90 day supply of the identical Fexofenadine 30 mg tablets was obtained for $11.99 by a HSP customer.

53.    Exhibit 12 was also gathered by relator Martinsen. It is an example of a script for Gabapentin 100 mg capsules, quantity 270 capsules for a 30 day supply, where Minnesota Medicaid paid $18.85, and the customer paid $1, for Script 0290808. (Exhibit 12, page 1) In stark contrast is Script 0290809, also on May 12, 2011, where the CVS customer on HSP received the identical 30 day supply of 270 capsules of Gabapentin for only $11.99. (Exhibit 12, page 2.)

54.     And even greater overpayment by Medicaid is demonstrated for Script 0290809 on page 3 of Exhibit 12, where a 90 day supply of the same Gabapentin 100 mg capsules was purchased for $11.99, by a customer under the HSP program.

55.     Another example is at Exhibit 13, on May 12, 2011, where relator Martinsen gathered Script 0290819 for Klor-con M 20 tablets, quantity 120, a 30 day supply, with Minnesota Medicaid paying $51.85, and the customer paying a $1 co-pay. (See page 1 of Exhibit 13.) On the same date, the CVS Health Savings Plan, on Script 0290823, provided a purchase price of only $15.98 for the identical 30 day supply of Klor-con. (See page 2 of Exhibit 13.) An even greater overbilling of Medicaid is demonstrated by page 3 of Exhibit 13, where the CVS Health Savings Plan customer received a 30 day supply for only $11.99. (See page 3 of Exhibit 13.) Relator Martinsen also gathered a script where a CVS Health Savings Plan customer obtained a 90 day supply of the identical Klor-con tablets for only $11.99, shown on p. 4 of Exhibit 13.

IX.     **TRICARE OVERBILLING SAMPLES**

56.     The federal payor programs described herein, other than Medicaid and Medicare Part D, are seen much less frequently for prescriptions by relator Martinsen in her particular pharmacy. However, attached as Exhibit 30 are two samples of over payment by the federally funded Tricare program, which is administered in Minnesota by EXPRESS SCRIPTS (a/k/a XPRESS RX). On the left side of Exhibit 30 is a January 28, 2013 "dummy" example prescription that relator Martinsen ran through XPRESS under the Tricare program, but reversed out so the charge actually never went through. As with all of the sample prescriptions attached as exhibits in this Amended Complaint, relator Martinsen actually called up the payor company to verify the price they would be paying for the prescription.

21

This January 28, 2013 "dummy" claim for Lisinopril, for 60 pills, a 60 day supply, demonstrated that the federal Tricare program would have been charged $23.85, and the military customer individual would have been charged $10 in co-pay, for a total charge of $33.85. This compares with only $11.99 that a customer would have paid in cash. Thus, the federal Tricare program would have been overbilled by $21.86.

57.     Also in Exhibit 30 is an actual Tricare prescription sale by relator Martinsen on January 28, 2013 for Lisinopril, the same drug. This actual prescription sale was for 30 pills, instead of 60 pills in the adjoining "dummy claim" prescription. These 30 pills were actually sold to a Tricare customer for $12.23 paid by Tricare, and a $5 co-pay by the military individual, for a total sale price of $17.23. Comparing that to the $11.99 CVS HSP price, the federal government through the Tricare program was overbilled $5.24.

## X.     THE MEDICARE PART D SYSTEM

58.     Medicare is a federally-funded health care insurance program created in 1965 by Title XVIII of the Social Security Act, and provides insurance coverage for people over the age of 65 and people with disabilities.  It is administered by the Centers for Medicare and Medicaid Services ("CMS"), which is a division of the United States Department of Health and Human Services ("HHS").

59.     Medicare Part A pays for, *inter alia,* items and services provided to hospital inpatients, home health care patients, and for patients of Skilled Nursing Facilities ("SNFs"). A SNF provides skilled care to a patient after an injury or a hospital stay if the patient meets certain conditions, and may be part of a nursing home or hospital. 42 U.S.C. §§ 1395c, 1395d.

60.     Medicare Part B is a federal program that covers physician services and certain injectable, inhalation and infused drugs administered by the health care provider. 42 U.S.C. §§ 1395j, 1395k, 1395I.

61.     Medicare Part C, also known as Medicare Advantage ("MA"), allows Medicare Part A and B eligibles to pay premiums to a provider network and receive their covered services through that network. The government pays the provider a monthly capitated amount to provide Medicare Part A and Part B items and services to the enrolled beneficiaries. 42 U.S.C. 1395w-21 et seq. For an additional premium, most plans also offer Medicare Part D outpatient drug coverage, and are known as MA-PD plans. Whether ultimately paid by the government directly or on a capitated basis, the government imposes certain reporting requirements to ensure that it is only paying for eligible drugs.

62.     Medicare Part D began January 1, 2006 and pays for prescription drug benefits for the elderly and disabled. 42 U.S.C. §1395w-101 et seq. Part D requires beneficiaries to enroll and pay certain premiums, deductibles, co-payments, and even 100% of drug costs after a certain dollar threshold and up to a maximum dollar amount (the "donut hole"), thereafter triggering catastrophic coverage. The federal government pays 75% of actual costs between the deductible and the donut hole, and 95% of catastrophic coverage. For low-income individuals there are various tiers in which the government pays greater percentages, up to a 100% subsidy which may be capitated.

1.     **Part D Sponsor**

63.     Unlike coverage in Medicare Parts A and B, Part D coverage is not provided within the traditional Medicare program.  Instead, Medicare beneficiaries must affirmatively

enroll in one of many hundreds of Part D Plans offered by private companies such as the Caremark Defendants. See MMA, Sections 1102, 1860D-1 through 1860D-42, and 1871 of the Social Security Act; 42 U.S.C. §§1302, 1395w-101 through 1395w-152, and 1395hh.

64.     A Medicare Part D Plan Sponsor (Part D Sponsor), whether it be a Part D Plan (PDP), or a Medicare Advantage Prescription Drug Plan (MA-PD), is an entity that is certified as meeting the requirements of Part D and that contracts with CMS to provide Part D benefits. Section 1860D-41, 42 U.S.C. §1395w-151(a)(13) and (14)(B). The term "Part D Sponsor" also includes employer and union-sponsored plans which offer qualified Part D prescription coverage. 42 C.F.R. §423.4.

65.     Under Part D, the process begins with the health insurance company submitting a certified application to CMS to participate as a Part D Plan Sponsor to provide prescription drug coverage to qualifying Part D Plans. 42 C.F.R. §§423.502, 423.265 and 423.272. That application is a prerequisite for contracting with CMS as a Part D Plan Sponsor. 42 C.F.R. §423.504(b).

66.     The Part D Plan Sponsor must also agree to comply with the requirements and standards of Part D and all the terms and conditions of payment. Section 1860D-12, 42 U.S.C. §1395w-112(b).

67.     The contract between the Part D Plan Sponsor and CMS must include the elements listed in 42 C.F.R. §423.505(b), including compliance with the reporting requirements of §423.514 and §423.329(b) for submitting drug claims and related information to CMS for its use in risk adjustment calculations. The Part D Plan Sponsor must also expressly agree to provide CMS with the information CMS determines is necessary to carry out payment provisions. 42 C.F.R. §423.505(b)(8) and (9).

68.     To qualify for Part D payments from CMS, before each plan year, each approved Part D Plan Sponsor must submit a bid, certified by an actuary, for each Part D Plan it will offer. 42 C.F.R. §423.265. The bid contains a per member per month (PMPM) cost estimate to provide Part D benefits to an average Medicare beneficiary in a particular geographic area. CMS considers both the tiered formulary structure and utilization management program components of the Part D Plan Sponsor's bid. 42 C.F.R. §423.272(a)(2). From those Part D Plan bids, CMS calculates nationwide and regional benchmarks which represent an average PMPM cost. If the Part D Plan Sponsor's bid exceeds the benchmark, the Plan Member must pay the difference.

69.     Once approved, the Part D Plan Sponsor may market its plans to eligible Medicare Part D beneficiaries, subject to CMS restrictions on marketing and enrollment. 42 C.F.R. §423.50.

70.     During each benefit year, CMS pays the Part D Plan Sponsors estimated payments on a monthly basis. In turn, Part D Plan Sponsors provide CMS with documentation of their actual costs. A required method for Part D Plan Sponsors to provide actual cost information to CMS is by submitting a Prescription Drug Event ("PDE") record for every prescription that is filled for its plan members.

71.     Thus, throughout the year, CMS makes prospective payments to Part D Sponsors for three subsidies based on the Sponsors' approved bids: (1) the direct subsidy (a monthly capitated payment) designed to cover the Sponsor's cost of providing the benefits; (2) the low-income cost-sharing subsidy (the Federal government's portion of cost-sharing payment for certain low-income beneficiaries); and (3) the reinsurance subsidy (the Federal government's share of drug costs for beneficiaries who have reached catastrophic coverage).

72. Each Plan participant (beneficiary) also pays a monthly premium to the Part D Plan, as determined under the Part D Regulations. 42 C.F.R. §§423.153 and 423.293.

73. In the year following each benefit year, CMS reconciles a PDP Sponsor's actual prescription drug costs as derived from its PDE records against the Sponsor's bid. If a PDP sponsor's actual costs exceed the estimated costs, the Sponsor may be able to recoup some of its losses through a risk-sharing arrangement with CMS. Conversely, if a Part D Plan Sponsor's estimated costs exceed its actual costs, the Sponsor may have to pay back some of its estimated payments to CMS.

74. CMS pays the Part D Sponsor under Medicare Part D. The Part D Sponsor then pays the Part D Plan pharmacies for prescriptions, less the Medicare beneficiary's co-pay.

2. **First Tier, Downstream, and Related Entities**

75. The regulations governing Part D benefits define major entities with which a Part D Sponsor may contract, 42 C.F.R. §423.505(i). See also CMS Prescription Drug Manual Chapter 9 - Part D Program to Control Fraud, Waste and Abuse, 40 - Part D Sponsor Accountability and oversight, p. 12. CMS has described these entities as "pharmacies or other providers, related entities, contractors, subcontractors, first tier and downstream entities."

76. A "First Tier Entity" is a party with whom the Part D Sponsor has a written contract "acceptable to CMS with a Sponsor or applicant to provide administrative services or health care services for a Medicare eligible individual under Part D." 42 C.F.R. §423.501.

77. In most cases, the "First Tier Entity" will be a pharmacy benefits manager company (PBM). CMS Prescription Drug Manual Chapter 9 - Part D Program to Control Fraud, Waste and Abuse, 40 - Part D Sponsor Accountability and oversight, p. 12.

78.     A "Downstream Entity" is any entity with a written contract with the Part D Sponsor "below the level of the arrangement between a Sponsor and a first-tier entity." 423.501. Downstream entities include the ultimate service providers of health and administrative services, i.e., pharmacies and further downstream below the pharmacy, the pharmacist. CMS Prescription Drug Manual Chapter 9 - Part D Program to Control Fraud, Waste and Abuse, 40 - Part D Sponsor Accountability and oversight, p. 12.

79.     By way of simple illustration, the Part D Sponsor enters into a contract with a PBM. The PBM is the First Tier Entity. The PBM then contracts with participating pharmacies to provide the dispensing services. The pharmacies are Downstream Entities. If the pharmacies then contract with pharmacists, the pharmacists would also be Downstream Entities. CMS Prescription Drug Manual Chapter 9 - Part D Program to Control Fraud, Waste and Abuse, 40 - Part D Sponsor Accountability and oversight, p. 12.

80.     A Related Part D entity is "an entity that is related to the Part D Sponsor by common ownership or control and either performs some of the Sponsor's management functions under contract or delegation, furnishes services to Medicare enrollees under oral or written agreements, or certain lease arrangements with the Sponsor. This includes, for example, where a Sponsor is the parent company of its own in-house PBM." 42 C.F.R. §423.501; CMS Prescription Drug Manual Chapter 9 - Part D Program to Control Fraud, Waste and Abuse, 40 - Part D Sponsor Accountability and oversight, p. 13.

3.     **Express Certifications Made by Sponsors**

81.     The Part D Sponsor is required to make several significant and material express certifications to CMS regarding its submission of Part D data used for payment:

a.    Certification of Data that Determines Payment:  "As a condition for receiving a monthly payment ... The Part D Plan sponsor agrees that its chief executive officer (CEO), the chief financial officer (CFO), or an individual delegated the authority to sign on behalf of one of these officers, and who reports directly to the officer, must request payment under the contract on a document that certifies (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of all data related to payment. The data may include specified enrollment information, claims data, bid submission data, and other data that CMS specifies." 42 C.F.R.  §423.505(k)(1).

b.    Certification of Enrollment and Payment Information:  "The CEO, CFO, or an individual delegated the authority to sign on behalf of one of these officers, and who reports directly to the officer, must certify (based on best knowledge, information, and belief) that each enrollee for whom the organization is requesting payment is validly enrolled in a program offered by the organization and the information CMS relies on in determining payment is accurate, complete, and truthful and acknowledge that this information will be used for the purposes of obtaining Federal reimbursement." 42 C.F.R. §423.505(k)(2).

c.    Part D Sponsor Certification of Claims Data:  "The CEO, CFO, or an individual delegated the authority to sign on behalf of one of these officers, and who reports directly to the officer, must certify (based on best knowledge, information, and belief) that the claims data it submits under §423.329(b()3) (or for fallback entities, under §423.871(f)) are accurate, complete, and truthful

and acknowledge that the claims data will be used for the purpose of obtaining Federal reimbursement." 42 C.F.R. §423.505(k)(3)

     d.   Certification of Bid Submission Information.  The CEO, CFO, or an individual delegated the authority to sign on behalf of one of these officers, and who reports directly to the officer, must certify (based on best knowledge, information, and belief) that the information in its bid submission and assumptions related to projected reinsurance and low income cost sharing subsidies is accurate, complete, and truthful  and  fully  conforms  to  the requirements in § 423.265." See, 42 C.F.R. §423.505(k)(4).

    82.   The Part D Sponsor is required to expressly certify to the accuracy and completeness of allowable costs for risk corridor and reinsurance information and of data for price comparison that it submits to CMS. 42 C.F.R. §423.505(k)(5) and (6).

    83.   Particularly relevant here, the entity submitting the Part D payment data, the Part D Sponsor or PBM, must also make express certifications to CMS regarding Part D data used for payment.  The Federal regulations provide that the entity submitting Part D claims data, the Part D Sponsor or the PBM, must execute the following certification:

> **"If the claims data are generated by a related entity, contractor, or subcontractor of a Part D plan sponsor, the entity, contractor, or subcontractor must similarly certify (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the data and acknowledge that the claims data will be used for the purposes of obtaining Federal reimbursement."**

42 C.F.R. §423.505(k)(3), (bold emphasis added).

    84.   A Part D Plan Sponsor, in contracting with CMS, also expressly "agrees to comply with Federal laws and regulations designed to prevent fraud, waste, and abuse,

including, but not limited to, applicable provisions of Federal criminal law [and] the False Claims Act (32 U.S.C. §§3729 et seq.)." 42 C.F.R. 423.505(h)(1).

85.   All of these certifications were made by the defendant sponsors of Medicare Part D.

**4.   Adjudicating Prescriptions in the Part D Process**

86.   Most Medicare beneficiaries who elect Part D coverage are responsible for certain costs, which may include a monthly premium, an annual deductible, and/or co-pays.

87.   After receiving a prescription from his or her doctor, the Part D Plan beneficiary goes to a retail pharmacy and presents the prescription to the pharmacist,  or submits a prescription to a mail order pharmacy.

88.   The pharmacy receives the prescription and participant's information, and then submits required data elements to a Sponsor likely through, its PBM to confirm Medicare Part D enrollment and identify co-pays. This typically takes place via real-time, computerized data transmissions between the pharmacy, the PBM and the Sponsor.

89.   The pharmacy must also comply with state law on pharmacy services.

90.   Where the Part D Plan Sponsor uses a PBM, the PBM reviews the pharmacy's initial data submission to conduct pre-dispensing/point-of-sale reviews of the Part D claim as required by federal law and the contracts between the Plan Sponsor, the PBM and the retail pharmacy.

91.   If the claim is not rejected by the Sponsor or PBM, the pharmacy receives payment authorization and co-pay information and dispenses the prescription. The beneficiary pays the co-pay to the pharmacy and receives the prescription.

92.    Once the PBM or Plan Sponsor receives that data from the pharmacy, the PBM or Plan Sponsor submits the claim data to CMS via a Prescription Drug Event ("PDE") record.

93.    The Part D Plan or its PBM is required to also submit other data to CMS, i.e., enrollment information, bid submission data, costs for risk corridor and reinsurance information, and data for price comparison. 42 C.F.R. 423.505(k).

94.    Part D Sponsors are also required to submit other information to CMS regarding costs of providing Part D coverage, i.e., administrative costs, rebates, and other information.

**5.    Payments to Sponsors Are Expressly Conditioned Upon Submission of Accurate, Complete and True PDE Data**

95.    In order to receive Part D funds from CMS, Part D Sponsors, their authorized agents, employees, and contractors (including pharmacies) are required to comply with all applicable Federal laws and regulations, as well as CMS instructions.  42 U.S.C. §1860D-12(b)(1); 42 C.F.R. §505(i)(4)(iv).

96.    As an express condition of payment by CMS, all part D Sponsors must submit data and information necessary for CMS to carry out the payment provisions found in § 1860D-15(c)(1)(C) and (d)(2) of the Social Security Act.  Thus, CMS payments to a Part D Sponsor are expressly conditioned upon the Sponsor providing "information to CMS that is necessary to carry out this subpart, or as required by law." 42 C.F.R. §423.322(a).

97.    Accordingly, all contracts between Part D Sponsors and CMS require the Part D Sponsor to agree to: "provide CMS with the information CMS determines is necessary to carry out payment provisions in subpart G of this Part (or for fallback entities, the information

necessary to carry out the payment provisions in subpart Q of this Part)." 42 C.F.R. 423.505(b)(9).

98.     In order to carry out these payment provisions, (42 C.F.R. §423.329 determination of payments), CMS mandatorily requires Part D Sponsors to submit data regarding drug claims that can be linked at the individual level to Part A and Part B and other information as CMS determines necessary. 42 C.F.R. §423.329(b)(3)(i) (data collection).

**6.     Required Data Elements for PDE Records**

99.     On April 27, 2006, CMS issued "Updated Instructions: Requirements for Submitting Prescription Drug Event Data (PDE)", in which CMS identified a set of data elements, which are necessary to determine payments to Medicare Part D PDP Sponsors. The Part D Plan must submit a PDE record for each and every dispensing event. "Updated Instructions: Requirements for Submitting Prescription Drug Event Data (PDE)," 4.27.2006, page 9.

100.    When Part D Sponsors or their PBMs report PDE data to CMS, these data elements include the costs associated with each dispensing event. CMS uses these PDE data elements, in part, to determine the capitated payments (monthly subsidy) paid for each Medicare Part D beneficiary. 42 C.F.R. § 423.505(k).

101.    The PDE record documents the final adjudication of a dispensing event by a PBM based upon claims received from pharmacies. "Updated Instructions: Requirements for Submitting Prescription Drug Event Data (PDE)," 4.27.2006, page 9.

102.    There are 37 set data elements for each PDE record: 15 elements for the National Council for Prescription Drug Program ("NCPDP") billing transaction; 5 data elements for the NCPDP billing response transaction; and 17 data elements identified by CMS

for purposes of administering Part D. "Updated Instructions: Requirements for Submitting Prescription Drug Event Data (PDE)," 4/27/2006, page 9.

103.   Most of the Medicare Part D PDE data elements are the same elements developed by the NCPDP, which have been used for decades by PBMs, pharmacies, and other providers when submitting Medicare and Medicaid claims for prescription drugs to CMS for payment. In its "Instructions for Submitting Prescription Drug Event Data," dated 4/27/2006, at page 11, CMS stated: "Most data elements represent existing NCPDP fields where we employ the same definition and field values that are currently in use per the NCPDP version 5.1 drug claim standard." NCPDP version 5.1 was approved in September of 1999.

104.   When CMS identified "Data Elements for PDE Records," it clearly stated, and all parties were on notice, that submission of PDE data is an express condition of payment: "In this section, we list the required data elements that must be submitted on PDE records for payment . . .This Section defines each data element and its specific potential for use for CMS's payment process." CMS "Updated Instructions: Requirements for Submitting Prescription Drug Event Data (PDE)," 4/27/2006, page 11, Sec. 2.

105.   CMS further described the purpose of the various PDE data elements as follows: "Much of the data, especially dollar fields, will be used primarily for payment. However, some of the other data elements such as pharmacy and prescriber identifiers will be used for validation of the claims as well as for other legislated functions such as quality monitoring, program integrity, and oversight." CMS "Updated Instructions: Requirement for Submitting Prescription Drug Event Data (PDE)," 4.27.2006, pages 5-6, Section 1.4. [Underlined emphasis added.]

106.   CMS provided that the reporting "requirements apply to all Part D Plans." "Updated Instructions:  Requirements for Submitting Prescription Drug Event Data (PDE)," 4/27/2006, page 5. Thus, CMS data reporting requirements and instructions apply to all Part D Plans (PDPs), Medicare Advantage Part Plans (MA-PDs), and any other entity providing Part D benefits.

7.     **Certification of Truth and Accuracy**

107.   Sponsors and their subcontractors, i.e., PBMs, when submitting Part D PDE data to CMS, must certify that all claims are true and accurate. 42 C.F.R. §423, 404 (k)(3); and CMS Prescription Drug Benefit Manual, Chapter 9 - Part D Program to Control Fraud, Waste, and Abuse, Section 80.1, p. 67, citing 42 C.F.R. §423.505(k)(3).

108.   Thus, CMS's Regulations for the submission of Part D PDE data place the legal risk of submitting invalid Part D claims data squarely with the submitting or generating entity: "CMS requires that **any entity that generates [Part D] claims data** on behalf of a Sponsor" must both: **"certify to CMS the accuracy, completeness, and truthfulness of that data;" and "acknowledge that the data will be used for purposes of obtaining Federal reimbursement."** See "Prescription Drug Benefit Manual, Chapter 9 - Part D Program to Control Fraud, Waste, and Abuse," page 16, Section 40-2; citing 42 C.F.R. §423.505(k)(3)0 (bold emphasis added).

109.   Since January 2006, this express certification of Part D PDE data has been included in CMS's Electronic Data Interchange (EDI) Agreement (or a similar document). The EDI Agreement must be executed in order for an eligible organization to submit PDE data electronically to CMS.  The EDI is executed by Medicare Plans offering Part D prescription drug benefit and/or the Part D PBMs who submit PDE data on behalf of Part D

Sponsors. The certification on the Part D EDI Agreement contains the following (or similar) language:

> **"By signing below, the eligible organization certifies that each submission of PDE data pursuant to this Agreement will be accurate and complete to the eligible organization's best knowledge, information and belief."**

110.    Defendants, through their subsidiary Part D sponsors and PBMs, have made such explicit certifications of PDE data from 2006 to the present. They continue to make these certifications on an ongoing basis to the Government.

111.    CMS also requires, through the EDI Agreement, that the Part D Sponsor both: "ensure that every electronic entry can be readily associated and identified with an original source document (e.g., an original drug claim) . . .," and "retain all original source documentation pertaining to any such particular Medicare prescription drug event for a period of at least 10 years after the prescription drug event is received and processed."

112.    CMS recognizes and warns that the submission of "inaccurate or incomplete prescription drug event (PDE) data" constitutes Part D fraud, waste, or abuse. CMS Prescription Drug Benefit Manual, Chapter 9 - Part D Program to Control Fraud, Waste, and Abuse," page 56.

113.    Moreover, Part D Sponsors are also explicitly required to correct all previously submitted PDE data if the data was erroneous when initially submitted. CMS 2007 Part D Reporting Requirements, page 4.

114.    Part D Sponsors are required to make PDE data submissions to CMS at the end of the coverage year (or no later than 5 months after the close of the year) including PDE records, adjustments, and deletions. See, 42 C.F.R. §423.308. Part D Sponsors must also submit cost reports at the end of the year. 42 C.F.R. §423.343. For 2006, however, CMS

collected cost data via PDE records instead of cost reports. "Updated Instructions: Requirements for Submitting Prescription Drug Event Data (PDE), 4/27/2006, page 10.

**8.     Part D Requires Compliance with All State Pharmacy Laws**

115.    Covered Part D drugs must be dispensed in accordance with State pharmacy laws and regulations. See 42 C.F.R. §423.504(b)(4)(vi)(A) (requiring compliance with applicable Federal and state standards); and 42 C.F.R. §423.153(c)(1) (Sponsors must represent that the network providers are required to comply with state pharmacy standards).

116.    The Defendants here, as, inter alia, network providers for the Part D Plan Sponsors, were required to comply with CMS Part D laws and all regulations mandating adherence to state pharmacy laws.

117.    The importance of adhering to applicable State laws in the provision of Medicare Part D prescription drug coverage is clear from Federal Regulations that require, as a condition precedent to a contract as a Part D Sponsor, "Any entity seeking to contract as a Part D Plan Sponsor must have administrative and management arrangements satisfactory to CMS, as demonstrated by at least . . . [a] compliance plan that consists of . . .[w]ritten policies, procedures, and standards of conduct articulating the organization's commitment to comply with all applicable Federal and State standards. 42 C.F.R. 423.504(b)(iv)(A).

**9.     Fraud, Waste and Abuse by Downstream Entities**

118.    Fraud, waste and abuse by a Part D PBM, as identified by CMS, includes most of the same examples listed for Part D Sponsors, but also includes failure to offer a beneficiary the negotiated price of a Part D drug. CMS Prescription Drug Manual, Chapter 9, Section 70.1.2, and pgs. 57-58.

**10.  Downstream Entities Must Comply with all Applicable Federal Laws, Regulations and CMS Instructions**

119.    42 C.F.R. §423.505(i)(4)(iv) provides that "If any of the Part D Plan Sponsors' activities or responsibilities under its contract with CMS is delegated to other parties, the following requirements apply to any related entity, contractor, subcontractor, or pharmacy:

> [a]ll contracts or written arrangements must specify that the related entity,
> contractor, or subcontractor must comply with all applicable Federal laws,
> regulations, and CMS instructions."

**XI.   CVS CAREMARK ENTITIES IN MEDICARE PART D PROGRAM**

120.    CVS Caremark claims to be the largest provider of prescription and related healthcare services in the United States, having handled more than one billion prescriptions since 2007.

121.    CVS Caremark operates retail, mail order, PBM, Medicare Part D Sponsor and pharmacy services businesses. In 2010, Defendant CVS Caremark's PBM handled approximately 585 million prescriptions, and its retail pharmacy branch filled approximately 636 million retail prescriptions, accounting for about 18% of the entire U.S. pharmacy market.

122.    In its retail pharmacy branch, CVS Caremark operates a national retail pharmacy network with over 60,000 participating pharmacies, including more than 6,000 retail CVS pharmacy stores, and on-line, mail order and specialty pharmacies.

123.    CVS Caremark offers a full range of pharmacy benefit management (PBM) services, including mail order pharmacy services, specialty pharmacy services, plan design and administration, formulary management, and claims processing.

124.    In 2007, CVS Caremark's largest customer was the Federal Employees Health Benefits Program ("FEHBP"). It continues to be one of its largest customers. CVS Caremark

37

has been administering the retail pharmacy benefit program for the largest FEHBP Plan, the Blue Cross and Blue Shield Government-wide Service Benefit Plan, (also known as the Federal Employee Program ("FEP") since 1993.

125.    All prescriptions managed by CVS Caremark, whether handled by one of its own mail service pharmacies or through its retail pharmacies, are uniformly and systematically analyzed, processed and documented by CVS Caremark's nationwide proprietary prescription management systems.

126.    According to CVS Caremark's own financial reports, these uniform computerized prescription management systems assist staff and network pharmacies in the processing of prescriptions by automating tests for various items, including plan eligibility, early refills, duplicate dispensing, appropriateness of dosage, drug interactions or allergies, over-utilization and potential fraud issues.

1.    **Sponsors of Medicare Part D**

127.    In 2005, Defendant Caremark Rx through its subsidiaries Caremark and SilverScript, formed SilverScript Insurance Company to participate as a Medicare Part D Plan (PDP) sponsor. On or about 2006, SilverScript Insurance Company obtained licenses from all 50 states, Washington, D.C. and Puerto Rico.

128.    Since 2006, Defendant, SilverScript Insurance Company has been approved by CMS as a prescription drug plan (PDP) Sponsor under Medicare Part D in all regions of the United States.

129.    SilverScript Insurance Company, a direct wholly-owned subsidiary of CVS Caremark Corporation, currently profits from Part D Plans in all 50 states, Washington D.C. and Puerto Rico.

130.   Since 2006, CVS Caremark has also served as a Medicare Prescription Drug Plan ("PDP") Sponsor through Accendo Insurance Company ("Accendo"). Effective January 1, 2009, Accendo replaced RXAmerica® as the Medicare-approved prescription drug plan for the RxAmerica Medicare Part D drug benefit plans.

131.   In December 2010, CVS Caremark announced an agreement to acquire the Medicare Part D business of Universal American Corp. ("UAM Medicare Part D business") for approximately $1.25 billion. This acquisition was completed on April 29, 2011.  Through its UAM Medicare Part D business, CVS Caremark provides Medicare prescription drug benefits to more than three million beneficiaries through the Community CCRxSM prescription drug plan.

## 2.   PBMs of Medicare Part D

132.   Since 2006, CVS Caremark has provided Part D PBM services to defendant Sponsors and to other Part D Sponsor corporations through the following subsidiaries: SilverScript, Inc.; Caremark RX, LLC; Caremark LLC; CaremarkPCS; CVS Caremark Part D Services, LLC; and RXAmerica, LLC.

133.   Defendant Caremark Rx, LLC (f/k/a Caremark Rx, Inc.) (hereafter "Caremark Rx") is one of the largest pharmaceutical services companies in the United States. It is incorporated under the laws of the state of Delaware, with its principal executive offices located at 211 Commerce Street, Suite 800, Nashville, Tennessee, 37201. Caremark Rx is the parent of CVS Caremark's pharmacy services subsidiaries.

134.   In 2006, and prior to the March 2007 merger, Caremark Rx was one of the largest pharmaceutical services companies in the United States with net revenues exceeding $36 billion. As of December 31, 2006, Caremark Rx employed more than 13,000 people.

135.   Caremark Rx's pharmaceutical services are referred to as pharmacy benefit management (PBM) services, and include both the dispensing of prescription drugs to eligible participants in benefit plans maintained by its customers, as well as the provision of drug benefits to eligible beneficiaries under the Federal government's Medicare Part D program.

136.   The PBM segment of CVS Caremark's business includes the provision of products and services to managed care entities that provide services to beneficiaries of Medicare, Medicaid, and other government-sponsored healthcare programs, as well as employers who qualify for the Part D retiree drug subsidy.

137.   Caremark Rx's PBM services are provided to its health plan clients and other clients that have qualified as Medicare Part D drug Plans, or PDPs. Caremark Rx's customers include sponsors of health benefit plans (employers, unions, government employee groups, insurance companies, and managed care organizations).

138.   CVS Caremark also participates extensively in the Medicare Part D Program by assisting employer, union, and other health plan clients that qualify for the Medicare Part D retiree drug subsidy by collecting and submitting eligibility and/or drug cost data to CMS as required under Part D in order for these employer, union, and other health plan clients to obtain Part D retiree drug subsidies.

139.   Defendant SilverScript, LLC (f/k/a SilverScript, Inc.) (hereafter SilverScript) is a Delaware limited liability company with its principal place of business at 2211 Sanders Road, Northbrook, IL 60062.

140.   From before January 1, 2006 through March 22, 2007, SilverScript was a wholly-owned subsidiary of Caremark Rx. SilverScript is now a wholly-owned subsidiary of Defendant CVS Carremark.

141.    During 2006 alone, Caremark Rx managed more than 516 million prescriptions for individuals from more than 2,000 organizations, including its largest customer, the FEHBP, which accounted for more than 16% of Defendant Caremark Rx's net revenue.

142.    From 2006 until sometime just prior to 2009, CVS Caremark provided Part D PBM services through its subsidiary SilverScript. Sometime before 2009, CVS Caremark's Part D PBM was known as and doing business as "CVS Caremark Part D Services, LLC." CVS Caremark Part D Services, LLC, is a Delaware limited liability corporation with its agent located at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

143.    Defendant Caremark, LLC (f/k/a/ Caremark, Inc.) is a California limited liability company which has its principal place of business at 2211 Sanders Road, Northbrook, IL 60062. Caremark, LLC is a wholly-owned PBM subsidiary of CVS Caremark, and yet another of defendants PBMs.

144.    In 2006 and before the March 2007 CVS-Caremark merger, Defendant PBM Caremark Rx conducted its operations through its subsidiaries, including but not limited to, Caremark, Inc. (now Defendant Caremark LLC) and CaremarkPCS (f/k/a AdvancePCS).

145.    The defendants' Medicare Part D sponsor corporations and PBM corporations also contract with many private corporations throughout the United States to provide Employee Group Waiver Plans (EGWPs) to provide and administer Medicare Part D drug benefits to its employees. The defendants' marketing of these EGWP plans intentionally steer employees via pricing incentives to purchase their generic drugs at the various CVS retail outlets, thus causing the federal government to pay higher than the U&C price for hundreds of thousands of those prescriptions. In addition, the federal government and the Medicare Part D

system provides huge subsidies for employees in these EGWP programs, which defendants also profit from.

### 3.    Retail of Medicare Part D

146.    CVS Caremark operates thousands of retail pharmacies, including mail order, on-line and specialty pharmacies that process and dispense Part D drugs to Medicare beneficiaries. These include the retail pharmacies of CVS Pharmacy, Inc.

## XII.    CVS CAREMARK REVENUES RELATED TO MEDICARE PART D SERVICES

147.    CVS Caremark's net revenues from the Medicare Part D system include sponsor payments received from CMS, payments to its PBMs, profits from its on-line, mail order and thousands of retail pharmacies, and EGWP contract profits.

148.    CVS Caremark's Part D insurance premiums received by its sponsor corporations are determined by the PDP's annual bid and related contractual arrangements with CMS. These premiums include a direct premium paid by CMS to CVS Sponsors and a beneficiary premium, which is the responsibility of the PDP member. This Part D beneficiary premium is subsidized by CMS in the case of low-income members. CVS Caremark collects Part D insurance premiums from beneficiaries and CMS, then recognizes them ratably as revenue over the period in which members are entitled to receive benefits.

149.    The Medicare Part D Program provides beneficiaries with assistance in paying for out-patient prescription drugs. This massive out-patient prescription drug benefit was added to Medicare by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, ("MMA"), Pub. L. 108-173 (Dec. 8, 2003), 42 U.S.C., §1395w-101 et seq. (2004 supplement), 42 C.F.R. §423.506.

150.    In addition to the Part D insurance premiums, CVS Caremark's revenues include co-payments, deductibles and co-insurance (collectively, the "Member Co-Payments") related to PDP members' actual prescription claims. CMS subsidizes a portion of these Member Co-Payments by paying CVS Caremark an estimated prospective Member Co-Payment subsidy each month. The prospective Member Co-Payment subsidy amounts received from CMS are also included in CVS Caremark's net revenues, and represented 2.6%, 3.5% and 1.3% of CVS Caremark's consolidated revenues in 2010, 2009 and 2008, respectively. If the prospective Member Co-Payment subsidies received differ from the amounts based on actual prescription claims, CVS Caremark records the difference as either accounts receivable or accrued expenses.

151.    The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA") created a drug subsidy program available to certain employer, union and other group plans that provide retiree coverage to Medicare Part D eligible individuals that is at least equivalent to Medicare Part D coverage. The Part D retiree drug subsidy is equal to 28% of drug costs, and, until 2013, was tax-free. CVS Caremark's revenues also include these retiree drug subsidies paid by CMS.

## XIII.  PARTICULARITY OF DEFENDANTS ILLEGAL OVERBILLING ON MEDICARE PART D CLAIMS

### 1.    Provider Agreement Samples

152.    The defendants certified to the federal government that they will comply with the Medicare pricing laws. Defendants further required that providers, including PBM corporations and retail pharmacies, shall legally promise to comply with the Medicare drug pricing laws in the various provider agreements that they require the PBMs and retails to

enter, as required by law. Attached as <u>Exhibit 17</u> is a sample of a true Caremark provider agreement that was drafted or issued on September 15, 2009, and was in effect in the middle of 2012. This provider agreement was drafted and issued by defendants and required to be agreed to by provider retail drug stores in Michigan and throughout the United States. It mandates compliance by the providing retail drug store "with all applicable Laws, including but not limited to those Laws referenced in the Federal State Laws and Regulations section (and attached Addendums thereto) set forth in the Provider Manual." (See Par. 6) A provider further agrees to the terms of Schedule A Network Participation and Payment also attached. It mandates reimbursement for drugs to the provider "at the lower of: . . . or (iv) Provider's U&C price less the applicable Patient Pay Amount." (See Par. 2 of Schedule A). Thus, defendants require PBMs and retail drug sellers of other companies and pharmacists to comply with charging the federal Medicare Part D program with the lowest U&C charge, yet it fraudulently refuses to provide those lower U&C charges to the Medicare Part D program through its own huge CVS system Part D participants, on millions of claims. Thus, it is unquestionably "knowingly" overcharging the Medicare Part D program.

153.    Attached as <u>Exhibit 19</u> is the Medicare Part D provider agreement issued by Humana, Inc., which is both a Sponsor and a PBM participant in the Medicare Part D program. <u>Exhibit 15</u> is the agreement between Humana, Inc. and retail drug providers, in a format issued in November, 2009. It contains true and accurate pages of a retail provider agreement for Medicare Part D participants through Humana. In Exhibit D of this provider agreement, Humana, Inc. mandates that the provider shall pay the lesser of the "usual and customary charge" or the other charging calculations. Humana is just one example of the

44

hundreds of Medicare Part D PBMs that the CVS retail pharmacies sell generic drugs to, and illegally charge higher than its usual and customary charge.

154.    Attached as Exhibit 18 are true and accurate copies of pages from a Medicare Part D provider agreement issued in 2011 by Medco Health Solutions Inc., a Sponsor of the Medicare Part D program, and thus another competitor of defendants' sponsored programs. It provides another example of the fraud. This provider agreement likewise provides a "Schedule A", which mandates that the retail drug stores entering the agreement provide that they will bill the Medicare Part D program a price for drugs "equal to the lower of (i) Pharmacy's Usual and Customary Price . . ." Medco is one of the many Medicare Part D Sponsors that CVS Caremark's retail sales outlets sell its generic drugs to. Defendants knowingly violate the law by charging more than its lower Usual and Customary Price as described above. Relator Martinsen has witnessed this overcharging to every one of the Medicare Part D PBMs or sponsors in the generic sales at her current CVS pharmacy, and in past CVS stores.

**2.    Retail Overbilling Samples**

155.    The following are some representative samples of such knowing, illegal overcharging of the Medicare Part D program:

A.    Attached as Exhibit 20 is a prescription sold to Caremark as the PBM for Medicare Part D on January 23, 2013, for KLOR-CON, where a 30 day supply, two pills taken per day, was sold for $23.84 for the 60 pills. Under the CVS HSP program, the price would have been $11.99. Thus, the federal government Medicare Part D program was overcharged by $11.85.

B.      Attached as Exhibit 21 are two more Caremark PBM paid prescriptions under the Medicare Part D program. On the left side, on January 15, 2013, a prescription for Isosorbide for 90 pills, one pill taken per day, had CVS retail charging the CVS PBM $41.13, when the HSP program would have charged only $11.99. Thus, the federal Medicare Part D program was overcharged by $29.14. On the right side of Exhibit 21, a prescription on February 6, 2013 for Metolazone for 30 pills, one to be taken daily, had the CVS retail store charge the CVS PBM under the Medicare Part D $27.85, when the HSP program would have charged only $11.99. Thus, the federal Medicare Part D program was overcharged $15.86.

C.      Attached as Exhibit 22 are two exemplar claims run by relator Martinsen through Humana, Inc., a PBM intermediary under the Medicare Part D program. Relator Martinsen ran these prescriptions and called Humana to verify their price on both, but then reversed the prescriptions without actually issuing. On the February 8, 2013 prescription for KLOR-CON for 90 pills, a 90 day supply, Humana would have paid $30.46, and the client would have paid $1.15 co-pay, for a total charge of $31.61 collected by CVS retail. Under the HSP program, a customer would only pay $11.99. Thus, the federal government under the Medicare Part D program would have been overcharged $19.62. For the Gabapentin prescription on February 8, 2013, for 270 pills, a 90 day supply (three pills taken by the patient per day), Humana would have been charged $22.84 and the customer would have paid $1.15 co-pay, for a total of $23.99. The HSP program would have only charged $11.99. Thus, the federal government under the Medicare Part D program would have been overcharged $12. Attached as Exhibit 23 is another "dummy claim" run by relator Martinsen through Humana as the PBM for Medicare Part D, which she reversed so the transaction ultimately did not go through. However, it proves that Humana would have paid $12.81, and the

customer paying $1.15, for a total of $13.96 for the Lisinopril, 90 pills, when the HSP price would have been only $11.99. Thus, the federal government under the Medicare Part D program would have been overcharged $1.97 on this prescription.

D.      Attached as Exhibit 24 are actual prescriptions issued by relator Martinsen, where UCare is the Medicare Part D Sponsor, and XPRESS RX is the PBM for UCare on the Medicare Part D. In the January 13, 2013 prescription on the left, for Digoxin for a 90 day supply of pills, the PBM/Sponsor paid $3.99, and the customer paid the $12.50 co-pay, for a total sale of $15.99. Under the CVS HSP program, the charge should have only been $11.99. Thus, the government should have paid $0 through the Medicare Part D program.  In the prescription on the right side of January 28, 2013, UCare and XPRESS paid $5.75, with the customer paying $12.50, for a total of $18.25 for a 90 day supply of Isosorbide (taken at only ½ pill per day, 45 pills).  Under the HSP program, it would have only been charged $11.99 for this 90 day supply. Thus, the government paid $5.75 through the Medicare Part D program, when it should not have paid anything.

E.      Attached as Exhibit 25 is a prescription issued by relator Martinsen again with the sale to UCare as the sponsor and XRESS RX as the PBM on December 22, 2012 for Metformin on a 90 day supply, 180 pills, for a price of $24.68, and a customer co-pay of $2.60, for a total of $27.28. Under the HSP program of CVS, the customer could have bought this prescription in cash for $25.99. This is different that the usual HSP charge of $11.99. For some reason, under the CVS HSP discount program, CVS charges this higher amount of $25.99 in six states, including Minnesota. Interestingly, this prescription drug was sold to the same customer as the prescriptions on Exhibit 24, where the customer paid $12.50 in co-pay for Digoxin and Isosorbide.  The customer only had to pay $2.60 co-pay for the Metformin,

which is a diabetic drug. With the total price charged by CVS retail of $27.28, the federal government through the Medicare Part D program still over paid $1.29.

F.      Attached as Exhibit 26 are two prescriptions with coverage by PBM Prime Therapeutics. On the left is a "dummy claim" run by relator Martinsen, which she reversed so the charges actually never went through. It is for Metformin, a 90 day supply, with two pills taken per day, so 180 pills issued, for a charge of $12.82 on Prime Therapeutics, and $7.26 co-pay by the customer, for a total charge of $20.08. This compares with only $11.99 under the CVS HSP program. This is the same Metformin drug that was charged $25.99 under the HSP program in the prescription on Exhibit 25. However, the prescription on Exhibit 26 is for the extended release version of Metformin, so the HSP discount price is the normal $11.99. Thus, the federal government under the Medicare Part D program would have been overcharged $8.09. On the right side of Exhibit 26 is an actual prescription issued by relator Martinsen on January 9, 2013 for Oxybutynin, a 90 day supply, where the customer takes two pills per day, so 180 pills issued, and the price charged was $7.61 to the PBM Prime Therapeutics, with a $6.34 co-pay by the customer, for a total charge of $13.95. The CVS HSP program would have only charged $11.99, so the federal government under the Medicare Part D program was overcharged $1.96 on this prescription.

G.      Attached as Exhibit 27 is another "dummy" or exemplar claim of a prescription sale to PBM Prime Therapeutics under the Medicare Part D program for Gabapentin, a 90 day supply, with three pills per day, so 270 pills issued. The charge would have been $15.81 to PBM Prime Therapeutics, with $7.79 co-pay by the customer, for a total charge of $23.60. Because the HSP program would have only charged $11.99, the federal government under the Medicare Part D program would have been overcharged $11.61.

H.     Attached as Exhibit 28 are two actual prescriptions issued by relator Martinsen to the Medicare Part D PBM Medco. The one on the left for November 26, 2012 is for Lisinopril (12.5 mg tablet), a 90 day supply, 90 pills, at $26.92 with a $0 co-pay by the customer.  Because the CVS HSP program would have only charged $11.99, the federal government under the Medicare Part D program was overcharged $14.93.  The prescription on the right of Exhibit 28 is an actual prescription sale by relator Martinsen on October 27, 2012 for Lisinopril (40 mg tablet) for 90 pills, and the charge to the Medco Medicare Part D PBM was $23.12, with the customer paying a $1.10 co-pay, for a total charge of $24.22. With the HSP CVS discount program charging only $11.99 to a cash customer, the federal government through the Medicare Part D program was overcharged $12.23. Attached as Exhibit 29 is another Medco prescription sold by relator Martinsen on November 26, 2012 for a Levothyroxine of 90 pills for $22.63 to Medco as the PBM on the Medicare Part D program. There was a $0 co-pay by the customer, so the federal government under the Medicare Part D program was overcharged $10.64, as the CVS HSP program would have only charged $11.99.

156.   On each of these sample Medicare Part D prescriptions handled by relator Martinsen from the CVS retail pharmacy at 8936 Lyndale Avenue, Bloomington, MN, she made sure to call the Medicare Part D PBM to verify the price that they would be paying, even though there was electronic authorization that verified some of the prescriptions, like the Humana PBM prescriptions on Exhibits 22 and 23.

## XIV.  VIOLATION OF DECEMBER 10, 2007 CORPORATE INTEGRITY AGREEMENT

157.   In December, 2007, defendant CVS Caremark Corporation entered a Corporate Integrity Agreement as part of the settlement of a Medicaid fraud billing False Claims Act

case, wherein defendant settled that case with the federal government, relator pharmacist Stephani Martinsen, and the following states:

> Alabama
>
> Indiana
>
> California
>
> Florida
>
> Massachusetts
>
> Minnesota
>
> Michigan
>
> Nevada
>
> New Hampshire
>
> Rhode Island

This Corporate Integrity Agreement, and its First Amendment, is attached as Exhbiit 31.

158.    As part of that Medicaid fraud settlement, in _LeFlore, ex rel. United States of America v. CVS Caremark Corporation_, defendant agreed in this Corporate Integrity Agreement (CIA) "to promote compliance with the statutes, regulations, and written directives of Medicare, Medicaid, and all other federal healthcare programs. . . The terms of this CIA shall be applicable to CVS Caremark's retail pharmacy subsidiary, CVS Pharmacy, Inc., and any division of any of CVS's subsidiaries or affiliates that conduct mail order pharmacy operations (collectively, "CVS").

159.    The term of this CIA was five years from the effective date, which was entered in December, 2007, with an effective date of March 14, 2008, which is a five year time period

when the defendants herein were committing the Medicare Part D, Medicaid, Tricare and other federal program "usual and customary" based fraud schemes described herein.

160.    In the "First Amendment to the Corporate Integrity Agreement", further obligations of defendant CVS Caremark Corporation were added for a period of three years, and specifically addressed the Medicaid programs in the above named states. This amendment expressly required a Medicaid billing review of 25 paid claims in each of ten states. This First Amendment of the CIA was entered on April 14, 2011. This three year amendment agreement specifically added intensive sampling investigations in each of the states for the dual-eligibility type of Medicaid fraud that was the subject of the *LeFlore, et al. v. CVS Caremark Corporation* lawsuit that was settled. However, the general obligations entered by the defendant to abide by Medicaid, Medicare and other federal healthcare payor programs remained in the CIA agreement effective over at least five years from March 14, 2008.

161.    The CIA contains specific monetary penalties for violation of the CIA, as well as "CVS's exclusion from participation in the Federal Healthcare Programs." (See pp. 25-27 of the CIA).

162.    As part of this CIA, defendants promised to establish and conduct an annual independent review of Medicaid billing and reimbursement practices by defendant in selected states and with specifically selected sample drugs to search for wrongful billing, and to provide that report with the federal Office of Inspector General (OIG) of the United States Department of Health and Human Services (HHS).  The defendant was further required to report any overpayments it received under any federal payor program.

163.    The CIA further required defendant to provide the HHS-OIG specific information in an annual report concerning the Independent Review Organization (IRO), to

identify all states it does business in, and provide "a description of CVS's corporate structure, including identification of any parent and sister companies, subsidiaries, and their respective lines of businesses." In addition, the annual reports were to provide a summary of its compliance activities and procedures, as well as a certification by defendants' Compliance Officer that the defendant was in compliance with all of the requirements of the CIA. (pp. 17-21 of CIA)

164. Defendant CVS and its IRO were also required to: "Analyze CVS's reimbursement from the Selected States Medicaid program for each available strength and form of each Selected Drug during the Reporting Period. The IRO shall review information under CVS's control, including but not limited to claims submission and reimbursement data, . . . claims submission policies, . . . and the Selected States' Medicaid Policies and Procedures. . . The IRO shall recommend corrective action in order to prevent further . . . improperly increasing aggregate reimbursement from the Medicaid Program, or otherwise violating any requirements of the Selected States' Medicaid Program." (p. 10 of CIA)

165. The CIA further requires the defendant to report overpayments it received from the government within 30 days of identification of the overpayment, and further requires that CVS take remedial steps within 60 days after identification (pp. 14-16 of CIA).

166. In addition to violating the Medicare and Medicaid laws described above, the defendants herein violated the terms of the Corporate Integrity Agreement described above by their illegal U&C billing described herein, and hiding of it and failure to report it.

<u>COUNT I</u>
Violations of Federal False Claims Act
Medicaid, Tricare and Other Federal Programs

167.    Relators-Plaintiffs incorporate by reference and re-allege all above paragraphs as if fully set forth herein.

168.    This Count is brought by Relators-Plaintiffs in the name of the United States against Defendants under the *qui tam* provisions of 31 U.S.C. §3729 et seq. Defendants violated 31 U.S.C. §3729(a)(l)(A) by knowingly presenting false Medicaid claims to the United States, in respect to the portions of Medicaid claims paid by the federal government. Defendants also violated 31 U.S.C. §3729(a)(1)(B) by knowingly making, using or causing to be made or used, false records or statements material to a false or fraudulent claim, in the form of electronic submissions to the Medicaid program that represented prices for the generic prescription drugs that were not truly the less expensive usual and customary prices.

169.    The false or fraudulent claims and statements were and are material to the United States paying higher than the legal usual and customary price for the prescription generic drugs on the Medicaid program, and the amounts of the claims were and are material as well.

170.    The False Claims Act violations described above were also made to the Tricare and other federal payor programs described above.

171.    As a result, plaintiff United States has paid and continues to pay the defendants, since 2008, millions of dollars in illegal overpayments under the Medicaid program.

172.    Defendants further violated the False Claims Act, as described above, by their violation of the March, 2008 Corporate Integrity Agreement that was entered by defendant CVS Caremark Corporation with the federal government.

## COUNT II
### Violations Of The False Claims Act
### Medicare Part D Program

173.    Relator incorporates by reference and re-allege all above paragraphs as if fully set forth herein.

174.    Defendant CVS Caremark Corporation, and its defendant subsidiary corporations, have systematically overbilled the Medicare Part D system since 2006. The foundation of this illegal overbilling was and is the knowing refusal to charge the lower usual and customary price for hundreds of generic drugs at their retail pharmacy outlets. The overbilling was and is financially compounded with the profits made by its PBM and sponsor corporations in the Part D system. It is further compounded by the sponsor bids that are partially based upon this U&C overbilling. Further illegal profits are made at the expense of the federal Part D system by the knowing overbilling of PBMs and sponsors other than CVS Caremark corporations in the Part D system, which also number in the hundreds, by the defendants' retail and PBM organizations. Its illegal overbillings also include higher risk-sharing and reconciliation payments for its Sponsor corporations that are based upon the inflated U&C billings, as well as higher inflated payments for its administration of union and private corporation connected Medicare Part D plans. Also, the defendants, through their retail outlets, knowingly ignored the requirement to provide the U&C lower prices required by the clear contract terms of its own PBMs and sponsors, as well as contract terms of other corporation PBMs and sponsors. In addition, the defendants' use of clear U&C billing

mandating clauses in its created Part D contracts with other companies led the federal government to believe that it was getting the benefit of the lower U&C prices from defendants, when it was not. The defendants' requiring other retailers by contract to provide the lower U&C pricing also served to make defendants' sponsor and PBM bids more competitive in the national market place, further adding to the profits of defendants.

175.    Since 2006, by its conduct described above in the Medicare Part D system, Defendants knowingly presented or caused to be presented false and/or fraudulent claims in violation of the Federal Civil False Claims Act, 31 U.S.C. §3729 (a)(1)(A) and the prior version of that statutory clause. It also knowingly misled the federal government, by its billings, contracts language and other representations in regard to the benefit of U&C pricing, when defendants knew it was not providing that benefit on millions of claims.

176.    Also in the Medicare Part D system, since 2006, defendants and their subsidiaries, and/or their agents, predecessors, successors, and employees knowingly made or used and caused to be made and used false records or statements in violation of the federal civil False Claims Act, 31 U.S.C. §3729(a)(1)(B) and the prior version of that statutory clause.    These records and statements were and are material to the federal government making payment for the generic drugs at issue under the Medicare Part D system.

177.    The false records or statements knowingly made, used or caused to be made or used by defendants in the Medicare Part D billings, in violation of §3729(a)(1)(B), include but are not limited to:

A.    the retail level billing statements, electronic or otherwise, made by defendants for the identified generic drugs;

B.    the PDE billing transmissions; and

C.   the billing statements issued by EGWP, union or employer connected Part D plans that were administered by defendants.

All of these billings were and continue to be claims that are subject to the $5,500 to $11,000 per claim penalty under the False Claims Act.

178.   Further records or statements violating §3729(a)(1)(B) made by defendants include, but are not limited to:

a.   the contracts it entered as retail outlets, PBMs or Sponsors in the Medicare Part D system, whether between its own subsidiaries or between one of its subsidiaries and other companies' retail outlets, PBMs or Sponsors;

b.   its billing information statements and records as and for its sponsor bids to CMS;

c.   its records and statements concerning billings as and for its risk adjustment and reconciliation additional payments from CMS, or concerning its paybacks of overpayments to CMS under the risk adjustment and reconciliation processes; and

d.   the records and statements on billing information as and for payments to its PBM and Sponsor subsidiaries participating in the Medicare Part D system.

179.   As a direct result, the Federal Medicare Part D, has been caused and continues to overpay defendants on at least:

A.   false or fraudulent Claims related to Part D prescription drugs that would not have been paid but for the Defendants' knowingly, illegal, improper, and reckless business practices;

B.   increased subsidies to Medicare Part D Plan Sponsors, including but not limited to defendants' corporation sponsors, through: direct advance monthly payments; reinsurance subsidies; low-income cost-sharing subsidies (or grants for low-income Part D individuals received in lieu of low-income subsidies); risk-sharing arrangements; year-end retroactive adjustments and reconciliations: and/or reinsurance payments made for private fee-for-service plans; and

C.   contracts with the Defendants as providers of Part D services, whether as a Sponsor, PBM, or other downstream entity, including but not limited to CMS's Electronic Data Interchange ("EDI") Agreement, and/or other agreements

which are necessary for Part D providers to submit claims or data to CMS and/or to receive payments related to the Medicare Part D program.

180.   Defendants utilize an automated nationwide claims adjudication system in all States where the Defendants provide PBM services, and, as a result, the Defendants' illegal and improper practices have caused the Federal government to pay false or fraudulent claims throughout the United States under the Medicare Part D system.

181.   As a direct and foreseeable result of the Defendants' above described improper and illegal practices, the Federal Medicare Part D system has overpaid defendants multiple millions of dollars, and continues to wrongfully overpay defendants.

182.   Defendants further violated the False Claims Act, as described above, by their violation of the March, 2008 Corporate Integrity Agreement that was entered by defendant CVS Caremark Corporation with the federal government.

## COUNT III
### California False Claims Act
### Cal. Government Code §§12650-12655

183.   Relators incorporate by reference and re-allege all above paragraphs as if fully set forth herein.

184.   This is a claim against defendants for treble damages and penalties on behalf of the State of California under the California False Claims Act, California Government Code §§12650-12655.

185.   By virtue of the above-described acts, among others, Defendants did knowingly overcharge the California Medicaid program for generic prescription drugs, in violation of California Code 12651(a)(1) and (2). Defendants knowingly caused false claims to be presented to the California Medicaid program, known as Medi-Cal, by illegally charging higher than its usual and customary prices. Defendants also knowingly made, used or caused

to be made or used false records or statements material to a false or fraudulent claim, in the form of electronic submissions to the Medicaid program that represented prices for the generic prescription drugs that were not truly the less expensive usual and customary prices.

**COUNT IV**
**Colorado Medical False Claims Act**
**Violation of Colorado Revised Statutes 25.5-4-303.5 to 25.5-4.309**

186.    Relators incorporate by reference and re-allege all above paragraphs as if fully set forth herein.

187.    This is a claim against defendants for treble damages and penalties on behalf of the State of Colorado under the Colorado False Claims Act, Violation of Colorado Revised Statutes 25.5-4-303.5 to 25.5-4.309.

188.    By virtue of the above-described acts, among others, Defendants did knowingly overcharge the Colorado Medicaid program for generic prescription drugs, in violation of Colorado Revised Statutes 25.5-4-303.5 to 25.5-4.309. Defendants knowingly caused  false claims to be presented to the Colorado Medicaid program, by illegally charging higher than its usual and customary prices. Defendants also knowingly made, used or caused to be made or used false records or statements material to a false or fraudulent claim, in the form of electronic submissions to the Medicaid program that represented prices for the generic prescription drugs that were not truly the less expensive usual and customary prices.

## COUNT V
### Connecticut Medicaid Fraud False Claims Act
### Conn. Public Act No. 09-5

189.   Relators incorporate by reference and re-allege all above paragraphs as if fully set forth herein.

190.   This is a claim against defendants for treble damages and penalties on behalf of the State of Connecticut under the Connecticut Medicaid Fraud False Claims Act Conn. Public Act No. 09-5.

191.   By virtue of the above-described acts, among others, Defendants did knowingly overcharge the Connecticut Medicaid program for generic prescription drugs, in violation of Conn. Public Act No. 09-5. Defendants knowingly caused false claims to be presented to the Connecticut Medicaid program, by illegally charging higher than its usual and customary prices. Defendants also knowingly made, used or caused to be made or used false records or statements material to a false or fraudulent claim, in the form of electronic submissions to the Medicaid program that represented prices for the generic prescription drugs that were not truly the less expensive usual and customary prices.

## COUNT VI
### Delaware False Claims and Reporting Act
### 6 Del C §1201(a)(1) and (2)

192.   Relators incorporate by reference and re-allege all above paragraphs as if fully set forth herein.

193.   This is a claim against defendants for treble damages and penalties on behalf of the State of Delaware under the Delaware False Claims and Reporting Act, 6 Del C §1201(a)(1) and (2).

194.   By virtue of the above-described acts, among others, Defendants did knowingly overcharge the Delaware Medicaid program for generic prescription drugs, in violation of 6 Del C §1201(a)(1) and (2). Defendants knowingly caused  false claims to be presented to the Delaware Medicaid program, by illegally charging higher than its usual and customary prices. Defendants also knowingly made, used or caused to be made or used false records or statements material to a false or fraudulent claim, in the form of electronic submissions to the Medicaid program that represented prices for the generic prescription drugs that were not truly the less expensive usual and customary prices.

## COUNT VII
### District of Columbia Procurement Reform Amendment Act
### Violation of D.C. CODE ANN. §§2-308.13-.15

195.   Relators incorporate by reference and re-allege all above paragraphs as if fully set forth herein.

196.   This is a claim against defendants for treble damages and penalties on behalf of the State of the District of Columbia, under the District of Columbia Procurement Reform Amendment Act, violation of D.C. CODE ANN. §§2-308.13-.15.

197.   By virtue of the above-described acts, among others, Defendants did knowingly overcharge the District of Columbia Medicaid program for generic prescription drugs, in violation of D.C. CODE ANN. §§2-308.13-.15. Defendants knowingly caused false claims to be presented to the District of Columbia Medicaid program, by illegally charging higher than its usual and customary prices. Defendants also knowingly made, used or caused to be made or used false records or statements material to a false or fraudulent claim, in the form of electronic submissions to the Medicaid program that represented

prices for the generic prescription drugs that were not truly the less expensive usual and customary prices.

## COUNT VIII
### Florida False Claims Act
### Fl. Stat. §68.081-68.090

198.   Relators incorporate by reference and re-allege all above paragraphs as if fully set forth herein.

199.   This is a claim against defendants for treble damages and penalties on behalf of the State of Florida under the Florida False Claims Act, violation of Fl. Stat. §68.081-68.090.

200.   By virtue of the above-described acts, among others, Defendants did knowingly overcharge the Florida Medicaid program for generic prescription drugs, in violation of Fl. Stat. §68.081-68.090. Defendants knowingly caused  false claims to be presented to the Florida Medicaid program, by illegally charging higher than its usual and customary prices. Defendants also knowingly made, used or caused to be made or used false records or statements material to a false or fraudulent claim, in the form of electronic submissions to the Medicaid program that represented prices for the generic prescription drugs that were not truly the less expensive usual and customary prices.

## COUNT IX
### Georgia State False Medicaid Claims Act
### Ga. Code 49-4-168 *et seq.*

201.   Relators incorporate by reference and re-allege all above paragraphs as if fully set forth herein.

202.   This is a claim against defendants for treble damages and penalties on behalf of the State of Georgia under the Georgia False Medicaid Claims Act, Ga. Code 49-4-168, et seq.

203.   By virtue of the above-described acts, among others, Defendants did knowingly overcharge the Georgia Medicaid program for generic prescription drugs, in violation of Ga. Code 49-4-168, et seq. Defendants knowingly caused false claims to be presented to the Georgia Medicaid program, by illegally charging higher than its usual and customary prices. Defendants also knowingly made, used or caused to be made or used false records or statements material to a false or fraudulent claim, in the form of electronic submissions to the Medicaid program that represented prices for the generic prescription drugs that were not truly the less expensive usual and customary prices.

## COUNT X
### Hawaii False Claims Act
### HAW. REV. STAT. §§661-21 to 661-29

204.   Relators incorporate by reference and re-allege all above paragraphs as if fully set forth herein.

205.   This is a claim against defendants for treble damages and penalties on behalf of the State of Hawaii under the Hawaii False Claims Act, violation of HAW. REV. STAT. §§661-21 to 661-29.

206.   By virtue of the above-described acts, among others, Defendants did knowingly overcharge the Hawaii Medicaid program for generic prescription drugs, in violation of HAW. REV. STAT. §§661-21 to 661-29. Defendants knowingly caused false claims to be presented to the Hawaii Medicaid program, by illegally charging higher than its usual and customary prices. Defendants also knowingly made, used or caused to be made or used false records or statements material to a false or fraudulent claim, in the form of electronic submissions to the Medicaid program that represented prices for the generic prescription drugs that were not truly the less expensive usual and customary prices.

## COUNT XI
### Illinois Whistleblower Reward and Protection Act
### 740 ILCS 175/1 *et seq.*

207.   Relators incorporate by reference and re-allege all above paragraphs as if fully set forth herein.

208.   This is a claim against defendants for treble damages and penalties on behalf of the State of Illinois under the Illinois Whistleblower Reward and Protection Act, violation of 740 ILCS 175/1 *et seq.*

209.   By virtue of the above-described acts, among others, Defendants did knowingly overcharge the Illinois Medicaid program for generic prescription drugs, in violation of 740 ILCS 175/1 *et seq..*  Defendants knowingly caused  false claims to be presented to the Illinois Medicaid program, by illegally charging higher than its usual and customary prices. Defendants also knowingly made, used or caused to be made or used false records or statements material to a false or fraudulent claim, in the form of electronic submissions to the Medicaid program that represented prices for the generic prescription drugs that were not truly the less expensive usual and customary prices.

## COUNT XII
### Indiana State False Claims and Whistleblowers
### Protection Act, IND. CODE ANN. § 5-11-5.5-1 — 5-11-5.5-18

210.   Relators incorporate by reference and re-allege all above paragraphs as if fully set forth herein.

211.   This is a claim against defendants for treble damages and penalties on behalf of the State of Indiana under the Indiana State False Claims and Whistleblowers Protection Act, Ind. Code Ann. §5-11-5.5-1 - 5.11-5.5-18.

212.   By virtue of the above-described acts, among others, Defendants did knowingly overcharge the Indiana Medicaid program for generic prescription drugs, in violation of Ind. Code Ann. §5-11-5.5-1 - 5.11-5.5-18. Defendants knowingly caused false claims to be presented to the Indiana Medicaid program, by illegally charging higher than its usual and customary prices. Defendants also knowingly made, used or caused to be made or used false records or statements material to a false or fraudulent claim, in the form of electronic submissions to the Medicaid program that represented prices for the generic prescription drugs that were not truly the less expensive usual and customary prices.

### COUNT XIII
**Louisiana Medical Assistance Programs Integrity Law**
**Louisiana Rev. Stat. §437 *et seq.***

213.   Relators incorporate by reference and re-allege all above paragraphs as if fully set forth herein.

214.   This is a claim against defendants for treble damages and penalties on behalf of the State of Louisiana under the Louisiana Rev. Stat. §437 et seq.

215.   By virtue of the above-described acts, among others, Defendants did knowingly overcharge the Louisiana Medicaid program for generic prescription drugs, in violation of Louisiana Rev. Stat. §437 et seq. Defendants knowingly caused false claims to be presented to the Louisiana Medicaid program, by illegally charging higher than its usual and customary prices. Defendants also knowingly made, used or caused to be made or used false records or statements material to a false or fraudulent claim, in the form of electronic submissions to the Medicaid program that represented prices for the generic prescription drugs that were not truly the less expensive usual and customary prices.

## COUNT XIV
## Maryland False Health Claims Act of 2010

216.    Relators incorporate by reference and re-allege all above paragraphs as if fully set forth herein.

217.    This is a claim against defendants for treble damages and penalties on behalf of the State of Maryland under the Maryland False Health Claims Act of 2010.

218.    By virtue of the above-described acts, among others, Defendants did knowingly overcharge the Maryland Medicaid program for generic prescription drugs, in violation of Maryland False Health Claims Act of 2010. Defendants knowingly caused false claims to be presented to the Maryland Medicaid program, by illegally charging higher than its usual and customary prices. Defendants also knowingly made, used or caused to be made or used false records or statements material to a false or fraudulent claim, in the form of electronic submissions to the Medicaid program that represented prices for the generic prescription drugs that were not truly the less expensive usual and customary prices.

## COUNT XV
## Massachusetts False Claims Act
## Massachusetts Gen. Laws c.12 §5A et seq.

219.    Relators incorporate by reference and re-allege all above paragraphs as if fully set forth herein.

220.    This is a claim against defendants for treble damages and penalties on behalf of the State of Massachusetts under the Massachusetts False Claims Act, Mass. Gen. Laws c.12§5A through 5.O.

221.    By virtue of the above-described acts, among others, Defendants did knowingly overcharge the Massachusetts Medicaid program for generic prescription drugs, in violation of Mass. Gen. Laws c.12§5A through 5.O. Defendants knowingly caused false

claims to be presented to the Massachusetts Medicaid program, by illegally charging higher than its usual and customary prices. Defendants also knowingly made, used or caused to be made or used false records or statements material to a false or fraudulent claim, in the form of electronic submissions to the Medicaid program that represented prices for the generic prescription drugs that were not truly the less expensive usual and customary prices.

### COUNT XVI
### Violation of the Michigan Medicaid False Claims Act
### MICH. COMP LAWS §400.601-400.613

222.    Relators incorporate by reference and re-allege all above paragraphs as if fully set forth herein.

223.    This is a claim against defendants for treble damages and penalties on behalf of the State of Michigan under the Michigan Medicaid False Claims Act, Mich. Comp Laws §400.601-400.613.

224.    By virtue of the above-described acts, among others, Defendants did knowingly overcharge the Michigan Medicaid program for generic prescription drugs, in violation of Mich. Comp Laws §400.601-400.613. Defendants knowingly caused false claims to be presented to the Michigan Medicaid program, by illegally charging higher than its usual and customary prices. Defendants also knowingly made, used or caused to be made or used false records or statements material to a false or fraudulent claim, in the form of electronic submissions to the Medicaid program that represented prices for the generic prescription drugs that were not truly the less expensive usual and customary prices.

## COUNT XVII
### Minnesota False Claims Act
### Violation of Minnesota Statute 15C.01, et seq.

225.    Relators incorporate by reference and re-allege all above paragraphs as if fully set forth herein.

226.    This is a claim against CVS Caremark Corporation for treble damages and penalties on behalf of the State of Minnesota under the Minnesota False Claims Act, violation of Minnesota Statute 15c.01, et seq.

227.    By virtue of the above-described acts, among others, Defendants did knowingly overcharge the Minnesota Medicaid program for generic prescription drugs, in violation of Minnesota Statute 15c.01, et seq. Defendants knowingly caused false claims to be presented to the Minnesota Medicaid program, by illegally charging higher than its usual and customary prices. Defendants also knowingly made, used or caused to be made or used false records or statements material to a false or fraudulent claim, in the form of electronic submissions to the Medicaid program that represented prices for the generic prescription drugs that were not truly the less expensive usual and customary prices.

## COUNT XVIII
### Violation of the Montana False Claims Act
### MONT. CODE ANN. § 17-8-401 — 17-8-412

228.    Relators incorporate by reference and re-allege all above paragraphs as if fully set forth herein.

229.    This is a claim against CVS Caremark Corporation for treble damages and penalties on behalf of the State of Montana under the Montana False Claims Act, Mont. Code Ann. §17-8-401 - 17.8-412.

230.   By virtue of the above-described acts, among others, Defendants did knowingly overcharge the Montana Medicaid program for generic prescription drugs, in violation of Mont. Code Ann. §17-8-401 - 17.8-412.  Defendants knowingly caused false claims to be presented to the Montana Medicaid program, by illegally charging higher than its usual and customary prices. Defendants also knowingly made, used or caused to be made or used false records or statements material to a false or fraudulent claim, in the form of electronic submissions to the Medicaid program that represented prices for the generic prescription drugs that were not truly the less expensive usual and customary prices.

## COUNT XIX
### New Jersey False Claims Act
### N.J. STAT. §2A:32C-1-17

231.   Relators incorporate by reference and re-allege all above paragraphs as if fully set forth herein.

232.   This is a claim against defendants for treble damages and penalties on behalf of the State of New Jersey under the New Jersey False Claims Act, N.J. Stat. §2A:32C-1-17.

233.   By virtue of the above-described acts, among others, Defendants did knowingly overcharge the New Jersey Medicaid program for generic prescription drugs, in violation of N.J. Stat. §2A:32C-1-17.  Defendants knowingly caused false claims to be presented to the New Jersey Medicaid program, by illegally charging higher than its usual and customary prices. Defendants also knowingly made, used or caused to be made or used false records or statements material to a false or fraudulent claim, in the form of electronic submissions to the Medicaid program that represented prices for the generic prescription drugs that were not truly the less expensive usual and customary prices.

## COUNT XX
### New Mexico Medicaid False Claims Act,
### N.M. STAT. ANN. §27-14-1- - 27-14-15

234.    Relators incorporate by reference and re-allege all above paragraphs as if fully set forth herein.

235.    This is a claim against defendants for treble damages and penalties on behalf of the State of New Mexico under the New Mexico False Claims Act, N.M. Stat. Ann. §27-14-1 - 27-14-15.

236.    By virtue of the above-described acts, among others, Defendants did knowingly overcharge the New Mexico Medicaid program for generic prescription drugs, in violation of N.M. Stat. Ann. §27-14-1 - 27-14-15. Defendants knowingly caused false claims to be presented to the New Mexico Medicaid program, by illegally charging higher than its usual and customary prices. Defendants also knowingly made, used or caused to be made or used false records or statements material to a false or fraudulent claim, in the form of electronic submissions to the Medicaid program that represented prices for the generic prescription drugs that were not truly the less expensive usual and customary prices.

## COUNT XXI
### New York False Claims Act
### N.Y. St. Finance Law §187 *et seq.*

237.    Relators incorporate by reference and re-allege all above paragraphs as if fully set forth herein.

238.    This is a claim against defendants for treble damages and penalties on behalf of the State of New York under the New York False Claims Act, violation of N.Y. St. Finance Law §187 *et seq.*

239.   By virtue of the above-described acts, among others, Defendants did knowingly overcharge the New York Medicaid program for generic prescription drugs, in violation of N.Y. St. Finance Law §187 *et seq.*. Defendants knowingly caused false claims to be presented to the New York Medicaid program, by illegally charging higher than its usual and customary prices. Defendants also knowingly made, used or caused to be made or used false records or statements material to a false or fraudulent claim, in the form of electronic submissions to the Medicaid program that represented prices for the generic prescription drugs that were not truly the less expensive usual and customary prices.

## COUNT XXII
### Nevada False Claims Act
### NEV. REV. STAT. ANN. §357.01-.250

240.   Relators incorporate by reference and re-allege all above paragraphs as if fully set forth herein.

241.   This is a claim against defendants for treble damages and penalties on behalf of the State of Nevada under the Nevada False Claims Act, violation of Nevada Rev. Stat. Ann. §357.01-.250.

242.   By virtue of the above-described acts, among others, Defendants did knowingly overcharge the Nevada Medicaid program for generic prescription drugs, in violation of Nevada Rev. Stat. Ann. §357.01-.250. Defendants knowingly caused false claims to be presented to the Nevada Medicaid program, by illegally charging higher than its usual and customary prices. Defendants also knowingly made, used or caused to be made or used false records or statements material to a false or fraudulent claim, in the form of electronic submissions to the Medicaid program that represented prices for the generic prescription drugs that were not truly the less expensive usual and customary prices.

## COUNT XXIII
### North Carolina False Claims Act
### In violation of North Carolina False Claims Act §1-605 et seq.

243.     Relators incorporate by reference and re-allege all above paragraphs as if fully set forth herein.

244.     This is a claim against defendants for treble damages and penalties on behalf of the State of North Carolina under the North Carolina False Claims Act, violation of North Carolina False Claims Act §1-605 et seq.

245.     By virtue of the above-described acts, among others, Defendants did knowingly overcharge the North Carolina Medicaid program for generic prescription drugs, in violation of North Carolina False Claims Act §1-605 et seq. Defendants knowingly caused false claims to be presented to the North Carolina Medicaid program, by illegally charging higher than its usual and customary prices. Defendants also knowingly made, used or caused to be made or used false records or statements material to a false or fraudulent claim, in the form of electronic submissions to the Medicaid program that represented prices for the generic prescription drugs that were not truly the less expensive usual and customary prices.

## COUNT XXIV
### Oklahoma Medicaid False Claims Act
### 63 Oklahoma Statutes, Sec. 5053.1 et seq.

246.     Relators incorporate by reference and re-allege all above paragraphs as if fully set forth herein.

247.     This is a claim against defendants for treble damages and penalties on behalf of the State of Oklahoma under the Oklahoma False Claims Act, violation of 63 Oklahoma Statutes, Sec. 5053.1 et seq.

248.   By virtue of the above-described acts, among others, Defendants did knowingly overcharge the Oklahoma Medicaid program for generic prescription drugs, in violation of 63 Oklahoma Statutes, Sec. 5053.1 et seq. Defendants knowingly caused false claims to be presented to the Oklahoma Medicaid program, by illegally charging higher than its usual and customary prices. Defendants also knowingly made, used or caused to be made or used false records or statements material to a false or fraudulent claim, in the form of electronic submissions to the Medicaid program that represented prices for the generic prescription drugs that were not truly the less expensive usual and customary prices.

## COUNT XXV
### Rhode Island False Claims Act

249.   Relators incorporate by reference and re-allege all above paragraphs as if fully set forth herein.

250.   This is a claim against defendants for treble damages and penalties on behalf of the State of Rhode Island under the Rhode Island False Claims Act, §9-1.1-3 et seq.

251.   By virtue of the above-described acts, among others, Defendants did knowingly overcharge the Rhode Island Medicaid program for generic prescription drugs, in violation of §9-1.1-3 et seq. Defendants knowingly caused false claims to be presented to the Rhode Island Medicaid program, by illegally charging higher than its usual and customary prices. Defendants also knowingly made, used or caused to be made or used false records or statements material to a false or fraudulent claim, in the form of electronic submissions to the Medicaid program that represented prices for the generic prescription drugs that were not truly the less expensive usual and customary prices.

## COUNT XXVI
### Tennessee Medicaid False Claims Act
### Tenn. Code. Ann. §71-5-181 to -185

252.    Relators incorporate by reference and re-allege all above paragraphs as if fully set forth herein.

253.    This is a claim against defendants for treble damages and penalties on behalf of the State of Tennessee under the Tennessee Medicaid False Claims Act, Tenn. Code. Ann. §71-5-181 to 185.

254.    By virtue of the above-described acts, among others, Defendants did knowingly overcharge the Tennessee Medicaid program for generic prescription drugs, in violation of Tenn. Code. Ann. §71-5-181 to 185. Defendants knowingly caused false claims to be presented to the Tennessee Medicaid program, by illegally charging higher than its usual and customary prices. Defendants also knowingly made, used or caused to be made or used false records or statements material to a false or fraudulent claim, in the form of electronic submissions to the Medicaid program that represented prices for the generic prescription drugs that were not truly the less expensive usual and customary prices.

255.    The false or fraudulent statements were material to Tennessee paying for the Medicaid claims described above.

256.    By reason of Defendant's unlawful acts, the State of Tennessee has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

## COUNT XXVII
### Tennessee False Claims Act
### Tenn. Code. Ann. §4-18-101 et seq.

257.    Relator incorporates by reference and re-alleges all the above paragraphs as if fully set forth herein.

258.    This is a claim against Omnicare for treble damages and penalties under the Tennessee False Claims Act, Tenn. Code. Ann. §4-18-101 et seq.

259.    By virtue of the above-described unlawful acts, and in violation of §4-18-103 (a)(1) and (2), defendant Omnicare knowingly caused false claims to be presented to the Tennessee Medicaid program. Defendant Omnicare also knowingly made, used or caused to be made or used false records or statements material to a false or fraudulent claim being submitted to the Tennessee Medicaid program, as described above.

260.    The false or fraudulent statements were material to Tennessee paying for the Medicaid claims described above.

261.    By reason of Defendant's unlawful acts, the State of Tennessee has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

## COUNT XXVIII
### Texas Medicaid False Claims Act
### TEX. HUM. RES. CODE ANN. §36.001-.132

262.    Relators incorporate by reference and re-allege all above paragraphs as if fully set forth herein.

263.    This is a claim against defendants for treble damages and penalties on behalf of the State of Texas under the Texas Medicaid False Claims Act, Texas Hum. Res. Code §36.001-.132.

264.    By virtue of the above-described acts, among others, Defendants did knowingly overcharge the Texas Medicaid program for generic prescription drugs, in violation of Texas Hum. Res. Code §36.001-.132. Defendants knowingly caused false claims to be presented to the Texas Medicaid program, by illegally charging higher than its usual and customary prices. Defendants also knowingly made, used or caused to be made or used false

records or statements material to a false or fraudulent claim, in the form of electronic submissions to the Medicaid program that represented prices for the generic prescription drugs that were not truly the less expensive usual and customary prices.

## COUNT XXIX
### Virginia Fraud Against Taxpayers Act
### VA. CODE ANN. 8.01-216.1-216.19

265.   Relators incorporate by reference and re-allege all above paragraphs as if fully set forth herein.

266.   This is a claim against defendants for treble damages and penalties on behalf of the State of Virginia under the Virginia Fraud Against Taxpayers Act, violation of Va. Code Ann. 8.01-216.1-216-19.

267.   By virtue of the above-described acts, among others, Defendants did knowingly overcharge the Virginia Medicaid program for generic prescription drugs, in violation of Va. Code Ann. 8.01-216.1-216-19. Defendants knowingly caused false claims to be presented to the Virginia Medicaid program, by illegally charging higher than its usual and customary prices. Defendants also knowingly made, used or caused to be made or used false records or statements material to a false or fraudulent claim, in the form of electronic submissions to the Medicaid program that represented prices for the generic prescription drugs that were not truly the less expensive usual and customary prices.

## COUNT XXX
### Wisconsin False Claims for Medical Assistance
### Wisconsin Statute §20.931

268.   Relators incorporate by reference and re-allege all above paragraphs as if fully set forth herein.

269.    This is a claim against defendants for treble damages and penalties on behalf of the State of Wisconsin under the Wisconsin False Claims for Medical Assistance Act, violation of Wisconsin Statute §20.931.

270.    By virtue of the above-described acts, among others, Defendants did knowingly overcharge the Wisconsin Medicaid program for generic prescription drugs, in violation of Wisconsin Statute §20.931. Defendants knowingly caused false claims to be presented to the Wisconsin Medicaid program, by illegally charging higher than its usual and customary prices. Defendants also knowingly made, used or caused to be made or used false records or statements material to a false or fraudulent claim, in the form of electronic submissions to the Medicaid program that represented prices for the generic prescription drugs that were not truly the less expensive usual and customary prices.

## PRAYER FOR RELIEF

271.    Pursuant to the Federal False Claims Act, the United States and relators request treble damages, a penalty of $5,000 to $11,000 per claim, and all attorneys' fees and costs allowed under the Act for the United States and the relators, against defendants.

272.    Pursuant to the false claim acts of the states, commonwealths, and the District of Columbia, the said political entities and relators request treble damages, all per-claim penalties, and attorneys' fees and costs for plaintiffs and relators, against defendants

273.    Relators request an appropriate share of the recoveries for the United States and all of the plaintiff states, commonwealths, and the District of Columbia, pursuant to their respective false claims acts.

## JURY DEMAND

Plaintiffs demand trial by jury on all claims.

SWARTZ & LYNCH LLP

By _____
      Timothy G. Lynch
      Attorney for Plaintiff/Relators
      BBO#546442
      Old City Hall - 45 School Street
      Boston, MA 02108
      (617)367-2882
      tlynch@swartzlynch.com

**WOJTALEWICZ LAW FIRM, LTD.**
      Brian Wojtalewicz
      Attorney for Plaintiffs/Relators
      MN Lic. #118369
      139 N. Miles, P.O. Box 123
      Appleton, MN  56208-0123
      (320)289-2363
      brian@wojtalewiczlawfirm.com

**ROBERT P. CHRISTENSEN, P.A.**
      Robert P. Christensen
      Attorney for Plaintiffs/Relators
      MN. Lic. #16597
      5775 Wayzata Boulevard, Suite 670
      St. Louis Park, MN 55416
      (612)333-7733
      bob@mnadvocatesforjustice.com

**NEIL P. THOMPSON, RPH, ESQ.**
      Neil P. Thompson
      Attorney for Plaintiffs/Relators
      MN. Lic. #0291638
      2249 East 38th Street
      Minneapolis, MN 55407-3083
      (612)246-4788
      nptrxlaw@gmail.com

**LEVANDER & VANDER LINDEN, P.A.**
      James G. Vander Linden
      Attorney for Plaintiffs/Relators
      MN. Lic. #112136
      5775 Wayzata Boulevard, Suite 670
      St. Louis Park, MN 55416
      (612)339-6841
      jim@vanderlindenlaw.com

### PROOF OF SERVICE

I, Laura Ascheman, hereby certify that a copy of the Amended *Complaint, with Exhibits, and Relators' Supplemental Disclosure Information*, were served via U.S. Mail, postage prepaid, Certified Mail-Return Receipt Requested on the 14th day of March, 2013 to the following:

Eric Holder, Attorney General
United States Department of Justice
950 Pennsylvania Ave., NW
Washington, DC  20530-0001

Carmen Milagros Ortiz
United States Attorney
George Henderson
Assistant United States Attorney
John Joseph Moakley United States Courthouse
One Courthouse Way
Boston, MA 02210

Eric Schneiderman, New York Attorney General
Attn: Medicaid Fraud Control Unit
The Capitol
Albany, NY  12224-0341

Kamala Harris
California Attorney General
Justice Department
Attn: Medicaid Fraud Control Unit
1300 "I" Street
Sacramento, CA  95814

Pam Bondy, Florida Attorney General
Attn: Medicaid Fraud Control Unit
PL-01 The Capitol
Tallahassee, FL  32399-1050

Alex Sink, CFO
Florida Department of Financial Services
200 East Gaines Street
Tallahassee, FL  32399-0300

Lisa Madigan, Illinois Attorney General
Attn: Medicaid Fraud Control Unit
100 West Randolph Street
Chicago, IL  60601

Greg Zoeller, Indiana Attorney General
Indiana Government Center South
Attn: Medicaid Fraud Control Unit
302 W. Washington St.
Indianapolis, IN 46204

David O. Thomas, Inspector General
Indiana Office of the Inspector General
315 West Ohio Street, Room 104
Indianapolis, IN 46202

James D. Caldwell, Louisiana Attorney General
Attn: Medicaid Fraud Control Unit
Livingston Bldg., P.O. Box 94005
1885 N. Third Street, 6th Floor
Baton Rouge, LA 70802

Steve Bullock, Montana Attorney General
Attn: Medicaid Fraud Control Unit
Justice Bldg.
215 N. Sanders
Helena, MT 59620-1401

Paula Dow, New Jersey Attorney General
Joshua Lichtblau, Assistant Attorney General
New Jersey Division of Criminal Justice
Medicaid Fraud Control Unit - FCA Unit
25 Market Street, P.O. Box 085
Trenton, NJ 08625-0085

Gary King, New Mexico Attorney General
Attn: Medicaid Fraud Control Unit
Villagra Bldg.
408 Galisteo Street
Santa Fe, NM 87501

Catherine Cortez Masto, Nevada Attorney General
Attn: Medicaid Fraud Control Unit
100 North Carson Street
Carson City, NV 89701

Greg Abbott, Texas Attorney General
Attn: Medicaid Fraud Control Unit
300 W. 15th Street
Austin, TX 78701

J.B. Van Hollen, Wisconsin Attorney General
Attn: Medicaid Fraud Control Unit
Office of the Attorney General
114 E. State Capitol
Madison, WI 53707

Robert E. Cooper, Jr., Tennessee Attorney General
Mary Elizabeth McCullohs, Assistant Attorney General
Attn: Medicaid Fraud Control Unit
500 Charlotte Avenue
Nashville, TN 37243

Peter Nickels, District of Columbia Attorney General
Jane Drummey, Assistant Attorney General
Assistant Attorney General
Public Advocacy Section
Civil Litigation Division
441 4th Street, NW, Suite 650 N
Washington, DC 20001

Thurbert E. Baker, Georgia Attorney General
Attn: Medicaid Fraud Control Unit
40 Capitol Square, SW
Atlanta, GA 30334

Bill Schuette, Michigan Attorney General
Attn: Medicaid Fraud Control Unit
G. Mennen Williams Bldg., 7th Floor
525 W. Ottawa St.
Lansing, MI 48909

Joseph R. "Beau" Biden, Attorney General
Daniel Miller, Director MFCU
Medicaid Fraud Control Unit of Delaware
Office of the Attorney General
820 N. French Street
Wilmington, DE  19801

Russell Suzuki, Attorney General
Michael L. Parrish, Director MFCU
Medicaid Fraud Control Unit of Hawaii
Office of the Attorney General
333 Queen Street, 10th Floor
Honolulu, HI  96813

Martha Coakley, Attorney General
Christopher Walsh, Director, MFCU
Medicaid Fraud Control Unit of Massachusetts
Office of the Attorney General
One Ashburton Place
Boston, MA  02108

W.A. Drew Edmondson, Attorney General
Niki Batt, Assistant Attorney General
Medicaid Fraud Control Unit
Oklahoma Office of the Attorney General
313 N.E. 21st Street
Oklahoma City, OK  73105

Patrick C. Lynch, Attorney General
Cindy Soccio, Director MFCU
Medicaid Fraud Control Unit of Rhode Island
Office of the Attorney General
150 S. Main Street
Providence, RI  02903

Kenneth Cuccinelli, II, Attorney General
Randall Clouse, Director MFCU
Attn.:  Ms. Tracey Smith
Medicaid Fraud Control Unit of Virginia
Office of the Attorney General
900 E. Main Street, 5th Floor
Richmond, VA  23219

John W. Suthers, Colorado Attorney General
Attn:  Medicaid Fraud Control Unit
1525 Sherman St.
Denver, CO 80203

George Jepsen, Attorney General
State of Connecticut
55 Elm Street
Hartford, CT 06106

Douglas F. Gansler, Maryland Attorney General
Attn:  Medicaid Fraud Control Unit
200 St. Paul Place
Baltimore, MD 21202

Lori Swanson, Minnesota Attorney General
Attn:  Medicaid Fraud Control Unit
1400 Bremer Tower
445 Minnesota Street
St. Paul, MN 55101

Roy Cooper, North Carolina Attorney General
Attn:  Medicaid Fraud Control Unit
5505 Creedmoor Road, Suite 300
Raleigh, NC 27612

Dated:  3-14-13