# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ⸻⸻⸻⸻⸻⸻⸻⸻ | ) |
| | ) |
| **UNITED STATES OF AMERICA ex rel.** | ) |
| **MYRON D. WINKELMAN et al.,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )   **Civil Action No. 11-11398-DJC** |
| | ) |
| **CVS CAREMARK CORPORATION et al.,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |
| ⸻⸻⸻⸻⸻⸻⸻⸻ | ) |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                **July 29, 2015**

### I.    Introduction

Pursuant to the *qui tam* provisions of the False Claims Act ("FCA"), 31 U.S.C. § 3730, plaintiff-relators Myron D. Winkelman ("Winkelman") and Stephani Martinsen[1] ("Martinsen") (collectively, "Plaintiff-relators") filed this lawsuit against Defendants CVS Caremark Corporation, CVS Pharmacy, Inc., Silverscript, LLC, Caremark, Rx LLC, (f/k/a Caremark Rx, Inc.), Caremark, LLC (f/k/a Caremark, Inc.), Caremark PCS, LLC, Silverscript Insurance Company, and Accendo Insurance Company (collectively, "CVS") alleging a violations of the FCA, 31 U.S.C. §§ 3729 *et. seq.*, and the false claim acts of the states of California, Connecticut, Florida, Georgia, Illinois, Indiana, Massachusetts, Michigan, Minnesota, New York and Virginia (collectively, "the Plaintiff-states"). D. 29. Defendants have moved to dismiss. D. 59. For the reasons stated below, the Court ALLOWS the motion.

---

[1]Formerly, Stephani LeFlore.

II.     **Standard of Review**

A.     <u>**Motion to Dismiss for Failure to State a Claim**</u>

In considering a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), the Court must determine if the facts alleged "plausibly narrate a claim for relief." <u>Schatz v. Republican State Leadership Comm.</u>, 669 F.3d 50, 55 (1st Cir. 2012). "[T]he plaintiff need not demonstrate she is likely to prevail" at this stage, only that her claims are facially plausible. <u>García-Catalán v. United States</u>, 734 F.3d 100, 102-03 (1st Cir. 2013). To state a plausible claim, a claim need not contain detailed factual allegations, but it must recite facts sufficient to at least "raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (internal citations omitted). This determination requires a two-step inquiry. <u>García-Catalán</u>, 734 F.3d at 103. First, the Court must distinguish the factual allegations from the conclusory legal allegations in the complaint. <u>Id.</u> Second, taking the Plaintiff-relators' allegations as true, the Court should be able to draw "the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> (citing <u>Haley v. City of Boston</u>, 657 F.3d 39, 46 (1st Cir. 2011)).

When deciding a motion to dismiss, the First Circuit has "emphasize[d] that the complaint must be read as a whole," and that circumstantial evidence may be sufficient to surpass the plausibility threshold. <u>Id.</u> At bottom, a claim must contain sufficient factual matter that, accepted as true, would allow the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> However, "[i]n determining whether a [pleading] crosses the plausibility threshold, 'the reviewing court [must] draw on its judicial experience and common sense.'" <u>Id.</u> (quoting <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 679 (2009)). "This context-

specific inquiry does not demand 'a high degree of factual specificity.'" Id. (internal citations omitted).

### B.      Motion to Dismiss for Lack of Subject Matter Jurisdiction

"When considering a motion to dismiss under subsection 12(b)(1) of the Federal Rules of Civil Procedure, the Court should apply a standard of review 'similar to that accorded a dismissal for failure to state a claim' under subsection 12(b)(6)." Menge v. N. Am. Specialty Ins. Co., 905 F. Supp. 2d 414, 416 (D.R.I. 2012) (quoting Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995)); see Puerto Rico Tel. Co. v. Telecomm. Regulatory Bd. of Puerto Rico, 189 F.3d 1, 13 n.10 (1st Cir. 1999) (noting that "the standard of review . . . is the same for failure to state a claim and for lack of jurisdiction"). In deciding a Rule 12(b)(1) motion, however, the Court may consider materials outside the pleadings. Gonzalez v. United States, 284 F.3d 281, 288 (1st Cir. 2002).

### C.      Motion to Dismiss for Pleading Fraud with a Lack of Particularity

"In alleging fraud . . . , a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). These heightened pleading requirements apply to claims brought under the FCA. See, e.g., United States ex rel. Gagne v. City of Worcester, 565 F.3d 40, 45 (1st Cir. 2009) (noting that "the heightened pleading requirements of Fed. R. Civ. P. 9(b) apply to [FCA] claims"); United States ex rel. Walsh v. Eastman Kodak Co., 98 F. Supp. 2d 141, 147 (D. Mass. 2000) (same). In such cases, relators must satisfy the requirements of Rule 9(b) by setting forth the "time, place, and content of an alleged false representation." Gagne, 565 F.3d at 45 (citation omitted) (internal quotation mark omitted); Alternative Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 29 (1st Cir. 2004) (noting that Rule 9(b) requires the pleader "to specify the who, what, where, and when of the allegedly false or fraudulent representation").

"Rule 9(b) may be satisfied if 'the complaint as a whole is sufficiently particular to pass muster under the FCA, although some questions remain unanswered.'"   United States ex rel. Ge v. Takeda Pharmaceutical Co. Ltd., No. 10-cv-11043, 2012 WL 5398564, at *4 (D. Mass. Nov. 1, 2012) (citation omitted).

## III.    Factual Background

Unless otherwise noted, the facts are as alleged in the second amended complaint, D. 29.

### A.    Applicable Federal and State Programs

Plaintiff-relators allege that CVS billed Medicaid programs and Medicare Part D inflated prices for hundreds of generic drugs.  D. 29 ¶ 3.  Medicaid was established by Title XIX of the Social Security Act, 42 USC §§ 1396 – 1396v, as amended, and provides medical assistance for certain individuals and families with low incomes.  Id. ¶ 17.  Medicaid is jointly funded by the federal and state governments.  Id.  Although national guidelines are established by the federal government, "each state:  (a) establishes its own eligibility standards; (b) determines the type, amount, duration and scope of services; (c) sets the rate of payment for services; and (d) administers its own program."  Id. ¶ 18.  For states to receive reimbursement, they must assure that their "aggregate payments must not exceed the lower of (1) the pharmacy's estimated acquisition cost plus a reasonable dispensing fee; or (2) the pharmacy's 'usual and customary charge to the general public' for the drug."  Id. ¶ 20b (emphasis in original) (citing 42 C.F.R. § 447.512(b)).   As a result, the state Medicaid programs of the Plaintiff-states require that pharmacies submit their usual and customary prices and will reimburse the lesser of the various measures.  Id.

Medicare is a federally-funded health care insurance program that provides insurance coverage for people over the age of 65 and people with disabilities.  Id. ¶ 53.  Medicare was

established in 1965 and is administered by the Centers for Medicare and Medicaid Services ("CMS"), a division of the U.S. Department of Health and Human Services ("HHS").  Id. Medicare Part D pays for prescription drug benefits.  Id. ¶ 57 (citing 42 U.S.C. § 1395w-101 *et seq.*).  Unlike other Medicare coverage, Part D coverage is not provided within the traditional Medicare program and beneficiaries must enroll in one of the Part D Plans offered by private companies.  Id. ¶ 65.  Medicare beneficiaries who elect Part D coverage are responsible for certain costs, including a monthly premium, an annual deductible and/or co-pays.  Id. ¶ 88.  The federal government uses economic incentives and disincentives to encourage reduced costs with the goal of paying 74.5% of the actual costs of basic prescription drug coverage.  Id. ¶ 57.  The Medicare Part D program also provides beneficiaries with assistance in paying for out-patient prescription drug benefits.  Id. ¶ 151.  This program was added to Medicare by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, ("MMA"), Pub. L. 108-173 (Dec. 8 2003), 42 U.S.C. § 1395w-101 *et seq.* (2004 supplement), 42 C.F.R. § 423.506.  Id.

To receive Part D funds from CMS, Part D Sponsors, including authorized agents, employees, and contractors (including pharmacies) are required to comply with all applicable federal laws and regulations, as well as CMS instructions.  Id. ¶ 97 (citing 42 U.S.C. § 1860D-12(b)(1); 42 C.F.R. § 505(i)(4)(iv)).  Specifically, Part D Sponsors must provide their Part D enrollees with access to negotiated prices for covered Part D drugs.  Id. ¶ 154 (citing 42 U.S.C. § 423.104(a)).  The government also requires the Part D Sponsor to "[g]uarantee that network and mail order pharmacies provide the <u>lower of</u> the negotiated price or the <u>usual and customary</u> price when a covered discount card drug for a negotiated price is available at the point of sale." Id. ¶ 156 (quoting 68 Fed. Reg. 69840, 69862 (Dec. 15, 2003)) (emphasis in original).  Medicare Part D defines "usual and customary" as "the price that an out-of-network pharmacy or

physician's office charges a customer who does not have any form of prescription drug coverage for a covered Part D drug." <u>Id.</u> ¶ 157 (quoting 70 Fed. Reg. 4194, 4219 (Jan. 28, 2005)).  With pharmacies now regularly offering discounted generic programs to their customers, the "usual and customary" prices are increasingly the lower price option.  <u>Id.</u> ¶ 158.

> **B.**     **<u>CVS Health Savings Pass Program</u>**

CVS is purportedly one of the largest providers of prescription and related healthcare services in the United States, handling more than one billion prescriptions since 2007.  <u>Id.</u> ¶ 122. In 2010, for example, CVS's pharmacy benefits manager company ("PBM") handled approximately 585 million prescriptions and its retail pharmacy branch filled approximately 636 million retail prescriptions, which accounts for approximately 18% of the U.S. pharmacy market. <u>Id.</u> ¶¶ 79, 123.  One of CVS's largest customers is the Federal Employees Health Benefits Plan ("FEHBP").  <u>Id.</u> ¶ 126.

Defendant Caremark Rx through its subsidiaries Caremark and Silverscript, formed Silverscript Insurance Company in 2005 to participate as a Medicare Part D Plan (PDP) sponsor. <u>Id.</u> ¶ 129.  Subsequently, Silverscript Insurance Company obtained licenses from all 50 states, plus Washington D.C. and Puerto Rico, and was approved by CMS as a prescription drug plan sponsor under Medicare Part D.  <u>Id.</u> ¶¶ 129-30.

On November 9, 2008, CVS began a fee-based generic discount program – the Health Savings Pass ("HSP").  <u>Id.</u> ¶¶ 25, 27; D. 29-1 at 1, 3.  Through the HSP CVS offered 90-day supplies of generic medications for a flat fee, typically $9.99.  <u>Id.</u> ¶ 30.  Plaintiff-relators allege that CVS knowingly designed the HSP to avoid reporting its HSP discount prices as its "usual and customary" prices when submitting claims to Medicaid and Medicare Part D.  <u>Id.</u> ¶¶ 26-34.

C.      *Change to Win* Report, Media Coverage and Investigations

On February 3, 2010, a coalition of labor unions, known as "Change to Win," published a study comparing drug prices charged to CVS customers through the HSP program with prices charged to the federal government. D. 61-1.[2]  The study was titled "CVS Caremark's Generic Rip Off:  How CVS Caremark Gouges American Taxpayers and Federal Employees on Generic Drugs."  Id. at 2.  The "Change to Win" study reported that:

> CVS Caremark has failed to offer its lowest price on hundreds of generic drugs to its single largest PBM client – the United States Government – as well as to millions of federal employees enrolled in the biggest federal employee healthcare plan, the Federal Employee Program (FEP), for which CVS Caremark provides prescription drug benefits. . . .  Indeed, if CVS Caremark offered the government and federal employees its publicly available $9.99 generic discount program price, taxpayers and federal workers could save hundreds of millions of dollars.

Id. at 3.  The news media immediately picked up the story and the study subsequently became the subject of congressional hearings and a report by the Congressional Research Services ("CRS").   For example, on February 3, 2010, Business Wire reported that "[i]n comparing these sets of prices, researchers found that the federal government and FEP plan participants paid more for 85% of the generic drugs available in CVS's generics discount program."  D. 61-2 at 2, "Change to Win Study Shows Drug Manager CVS Caremark Charges More for Generic Drugs to Federal Employees and US Government than Walk-in Customers," Business Wire (Feb. 3, 2010).  Later that month, a "Change to Win" representative testified before a congressional subcommittee that "if CVS Caremark offered its lowest price for generic drugs to the

---

[2] The Court may consider materials outside the pleadings in support of CVS's motion under Rule 12(b)(1).  See McIntyre v. United States, 367 F.3d 38, 42 (1st Cir. 2004) (noting that "on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1), the court may look to supplemental materials in addition to pleadings") (citation omitted).  In addition, to evaluate the FCA's public disclosure bar, the Court "may take judicial notice of public records or indisputably authentic documents on a 12(b)[(6)] motion . . ."  Branch v. F.D.I.C., 825 F. Supp. 384, 398 n.8 (D. Mass. 1993); LoCicero v. Leslie, 948 F. Supp. 10, 12 (D. Mass. 1996) (citation omitted).

government for all the drugs that are part of its discount program, federal employees and the government could save hundreds of millions of dollars." D. 61-7 at 4, FEHBP Prescription Drug Integrity, Transparency, and Cost Savings Act: Hearing on H.R. 4489 Before the Subcomm. on the Fed. Workforce, Postal Serv., and the Dist. of Columbia, 111th Cong. 77–84 (2010) (statement of Jasmin Weaver, Healthcare Initiatives Legislative Director, Change to Win). The same day, <u>Business Wire</u> further reported that CVS "charges the US government and millions of federal employees more for hundreds of generic drugs than customers at CVS pharmacies who use <u>no insurance</u>." D. 61-8 at 3, Change to Win Poll Finds Federal Health Plan Participants Overwhelmingly Support Legislation to Reduce Prescription Drug Costs in FEHBP, Business Wire (Feb. 23, 2010) (emphasis in original).

On the heels of these investigations and reports, the Attorney General of Connecticut launched an investigation into the differences between CVS's prices under the HSP program and Connecticut's Medicaid program. D. 61-10, Press Release, Connecticut Attorney General's Office, Attorney General Investigating CVS Caremark Threat To Terminate Consumer Discount Drug Program (June 22, 2010). The Connecticut investigation was also widely reported by local and national media outlets. <u>See, e.g.</u>, D. 61-14 at 2, Cara Baruzzi, "State Opposes CVS Ending Drug Plan," <u>New Haven Register</u> (June 24, 2010).

## IV.    Procedural History

Plaintiff-relators instituted this action on August 4, 2011, D. 1, and filed an amended complaint on March 19, 2013, D. 20. The United States notified the Court pursuant to the FCA, 31 U.S.C. § 3730(b)(4)(B), of its decision not to intervene in the action on October 11, 2013. D. 24. All commonwealths, the District of Columbia and all named states, except for Texas, also declined to intervene at that time. <u>Id.</u> On June 5, 2014, Plaintiff-relators filed a second amended

complaint that did not include a number of previously named states, including the state of Texas. D. 29.  The Court unsealed the second amended complaint on August 11, 2014.  D. 30.  CVS has now moved to dismiss.  D. 59.  The Court heard the parties on the pending motion and took the matter under advisement.  D. 69.

## V.  Discussion

The FCA prohibits the knowing submission of false or fraudulent claims to the United States, 31 U.S.C. § 3729(a), and "allows private persons, called relators, to bring qui tam actions on behalf of the United States against persons or entities who knowingly submit false claims to the federal government."  United States ex rel. Ondis v. City of Woonsocket, 587 F.3d 49, 53 (1st Cir. 2009) (citing 31 U.S.C. § 3730(b)(1)).  "A person acts 'knowingly' if he or she '(1) had actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information.'"  United States ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 380 (1st Cir. 2011) (quoting 31 U.S.C. § 3729(b)).  A person who violates the FCA may be liable for double or treble damages, plus the costs incurred in bringing the action.  31 U.S.C. § 3729(a)(2)-(3).  Conversely, if a *qui tam* action is successful, the relator shares in the proceeds of the action or settlement.  31 U.S.C. § 3730(d).  "Although this financial incentive encourages would-be relators to expose fraud, it also serves to attract those looking to capitalize on fraud already exposed by others."  United States ex rel. Poteet v. Bahler Med., Inc., 619 F.3d 104, 107 (1st Cir. 2010).  As such, "the FCA contains a provision disallowing qui tam actions that are based on prior public disclosures of fraud, as long as the disclosures were made in statutorily specified sources."  Id. (citing 31 U.S.C. § 3730(e)(4)(A)).

A.      <u>The FCA's Public Disclosure Bar</u>

Here, CVS first argues that Plaintiff-relators' second amended complaint should be dismissed pursuant to the public disclosure bar of the FCA.  D. 60 at 11-18; <u>see</u> 31 U.S.C. § 3730(e)(4)(A).  "The public disclosure bar is designed to foreclose qui tam actions in which a relator, instead of plowing new ground, attempts to free-ride by merely repastinating previously disclosed badges of fraud."  <u>Nasuti ex rel. United States v. Savage Farms, Inc.</u>, No. 12-cv-30121-GAO, 2014 WL 1327015, at *14 (D. Mass. Mar. 27, 2014) (citation and internal quotation mark omitted); <u>see</u> <u>United States ex rel. Rost v. Pfizer, Inc.</u>, 507 F.3d 720, 727 (1st Cir. 2007) (noting that "[t]he qui tam mechanism has historically been susceptible to abuse, however, by 'parasitic' relators who bring FCA damages claims based on information within the public domain or that the relator did not otherwise discover") (overruled on other grounds).  The provision provides that:

> [t]he court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—
>
> > (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
> >
> > (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
> >
> > (iii) from the news media,
>
> unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730 (e)(4)(A).  The statute defines "original source" as "an individual who . . . prior to a public disclosure . . . has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of

and materially adds to the publicly disclosed allegations or transactions . . . ."   Id.
§ 3730(e)(4)(B).

### 1. Public Disclosure Provision Is No Longer a Jurisdictional Bar

As a threshold matter, the parties dispute whether the public disclosure bar is
jurisdictional in nature.  D. 67 at 10; D. 68 at 9-10.  As the parties acknowledge, the public
disclosure bar was amended by the Patient Protection and Affordable Care Act, Pub. L. No. 111–
148, § 10104(j)(2), 124 Stat. 119 (Mar. 23, 2010) (the "PPACA").  D. 60 at 12 n.15; D. 67 at 10.
The amended version applies to this lawsuit.[3]  United States ex rel. Booker v. Pfizer, Inc., 9 F.
Supp. 3d 34, 44 n.3 (D. Mass. 2014).  Before amendment, the public disclosure bar was
unmistakably jurisdictional.  See 31 U.S.C. § 3730(e)(4)(A) (2006) (providing that "[n]o court
shall have jurisdiction over an action under this section based upon the public disclosure of
allegations . . .").  The 2010 amendment eliminated the jurisdictional language, however, and the
parties now dispute the effect of this amendment.

While the First Circuit has not specifically addressed whether the public disclosure bar
remains jurisdictional, it has continued to refer to the amended "public disclosure provision of
the FCA" as a "jurisdictional bar."  Estate of Cunningham, 713 F.3d at 669 n.5 (noting that "[i]n
2010, Congress amended the public disclosure provision of the FCA and explicitly narrowed the
jurisdictional bar to disclosures in federal rather than federal and state cases or hearings").
District courts in this circuit have split, however, on whether the amended public disclosure
provision is jurisdictional.  Compare United States ex rel. D'Agostino v. EV3, Inc., No. 10-cv-

---

[3] "Jurisdiction is determined based on whether it existed at the time the plaintiff filed the
original complaint."  United States ex rel. Estate of Cunningham v. Millennium Labs. of
California, Inc., 713 F.3d 662, 669 (1st Cir. 2013) (citing Sallen v. Corinthians Licenciamentos
LTDA, 273 F.3d 14, 23 (1st Cir. 2001)).

11822-RGS, 2014 WL 4926369, at *5 (D. Mass. Sept. 30, 2014) (treating amended public disclosure bar as jurisdictional) (appeal filed), and Nasuti, 2014 WL 1327015, at *6 n.6 (noting "that the 'public disclosure bar' . . . also represents a potential jurisdictional infirmity" and that "federal courts should decide subject matter jurisdiction questions as a threshold issue"), with United States ex rel. Hagerty v. Cyberonics, Inc., No. 13-cv-10214-FDS, 2015 WL 1442497, at *11 (D. Mass. Mar. 31, 2015) (concluding that the public disclosure bar is no longer jurisdictional and examining the public disclosure issue under Rule 12(b)(6)).

The Court agrees with the courts that have concluded the public disclosure bar is no longer jurisdictional in nature, including other circuits that have considered the question directly. See United States ex rel. May v. Purdue Pharma L.P., 737 F.3d 908, 916 (4th Cir. 2013) (holding that the PPACA amendments "make it clear that the public-disclosure bar is no longer a jurisdiction-removing provision"); United States ex rel. Osheroff v. Humana, Inc., 776 F.3d 805, 810-11 (11th Cir. 2015) (holding "that the amended § 3730(e)(4) creates grounds for dismissal for failure to state a claim rather than for lack of jurisdiction" as "Congress removed the prior language that rendered the public disclosure bar jurisdictional in nature" and noting that "[t]he amended section also provides that the government can oppose dismissal, allowing the case to proceed even if the public disclosure provision would otherwise apply").  The amendment removed the clear jurisdictional language from the provision "and replaced it with a generic, not-obviously-jurisdictional phrase ('shall dismiss'), while at the same time retaining jurisdiction-removing language in §§ 3730(e)(1) and (e)(2)." May, 737 F.3d at 916.

Absent a clear statement, the Court should not classify a statutory limitation as jurisdictional.  Sebelius v. Auburn Reg'l Med. Ctr., ___ U.S. ___, 133 S.Ct. 817, 824 (2013); see Hagerty, 2015 WL 1442497, at *11 (noting that "to determine whether to classify a statutory

limitation as jurisdictional . . . [courts] inquire whether Congress has clearly stated that the rule is jurisdictional" (citation and internal quotation mark omitted)).  This is especially true where, as here, Congress has specifically removed the jurisdictional language.  Moreover, as a court in this district has noted, "under the amended version of the FCA, claims are dismissed under a valid assertion of the public-disclosure bar 'unless opposed by the Government.'"  Hagerty, 2015 WL 1442497, at *11 (quoting 31 U.S.C. § 3730(e)(4)(A)).  Therefore, the amended provision "appears to be non-jurisdictional because it confers on the government the power to prevent the dismissal of an FCA claim that would otherwise fall within the public-disclosure bar" and "[s]ubject-matter jurisdiction can never be waived or forfeited."  Id. (citation omitted).

Accordingly, the Court will evaluate the public disclosure bar question under the familiar Rule 12(b)(6) motion to dismiss standard.[4]

### 2.    *Public Disclosure*

To determine whether the public disclosure bar applies, the Court "employ[s] a multi-part inquiry."  Poteet, 619 F.3d at 109 (quoting Ondis, 587 F.3d at 53).  For the bar to apply, the Court must determine: "(1) whether there has been public disclosure of the allegations or transactions in the relator's complaint; (2) if so, whether the public disclosure occurred in the manner specified in the statute; (3) if so, whether the relator's suit is [substantially the same as] those publicly disclosed allegations or transactions; and (4) if the answers to these questions are in the affirmative, whether the relator falls within the 'original source' exception as defined in

---

[4] The Court nevertheless notes that since the standard of review for failure to state a claim under Fed. R. Civ. P. 12(b)(6) is similar to that accorded under Fed. R. Civ. P. 12(b)(1), see, e.g., Murphy, 45 F.3d at 522, this is largely "a distinction without a difference."  Puerto Rico Tel. Co., 189 F.3d at 13 n.10.

§ 3730(e)(4)(B)."[5]   Rost, 507 F.3d at 728 (overruled on other grounds).   "If any of these

questions are answered in the negative, the public disclosure bar is inapplicable."   Poteet, 619

F.3d at 109.

A public disclosure of fraud is deemed to have "occur[red] when the essential elements

exposing the particular transaction as fraudulent find their way into the public domain."   Ondis,

587 F.3d at 54.   To sufficiently disclose fraud, "a disclosure must either contain [1] a direct

allegation of fraud or [2] allow for a proper inference of fraud by revealing a misrepresented

state of facts in conjunction with a true state of facts."   Estate of Cunningham, 713 F.3d at 670

(citation omitted).

In the instant case, there was extensive publicity alleging that CVS deprived the

government the benefit of its HSP prices.[6]   These prior, public disclosures reported that CVS was

overcharging federal and state governments by not offering governments the same prices offered

to HSP program members, see D. 61-1-61-6, and that CVS had systematically deprived the

---

[5] The prior version of the public disclosure bar asked whether the relator's suit was "based upon" information that was publicly disclosed, see 31 U.S.C. § 3730(e)(4)(A) (1986), which the First Circuit had interpreted to mean "substantially similar" to the information disclosed.   Ondis, 587 F.3d at 58 (holding "that the 'based upon' requirement is satisfied when the relator's allegations are substantially similar to allegations or transactions already in the public domain at the time he brings his qui tam action").   Subsequently, Congress amended the statute to ask whether the "substantially the same" allegations had been publicly disclosed, which is consistent with First Circuit precedent.

[6] As noted above, the Court "may take judicial notice of public records or indisputably authentic documents on a 12(b)(6) motion."   Branch, 825 F. Supp. at 398 n.8; Hagerty, 2015 WL 1442497, at *11 (relying on news articles "when evaluating the FCA's public-disclosure bar because they are (at least in this context) susceptible to judicial notice" (citing Ping Chen ex rel. United States v. EMSL Analytical, Inc., 966 F. Supp. 2d 282, 294 (S.D.N.Y. 2013) (considering "judicially-noticeable public disclosures"); Staehr v. Hartford Fin. Servs. Group, Inc., 547 F.3d 406, 425 (2d Cir. 2008) (taking judicial notice of "the fact that press coverage . . . contained certain information, without regard to the truth of their contents") (emphasis omitted)).

government of the benefit of its HSP program prices, calling the deprivation a "Rip Off" and a violation of the law.  See D. 61-1; D. 61-11.  These media reports, as well as the congressional testimony and congressional reports, are disclosures to the public.  Poteet, 619 F.3d at 110 (noting that "[t]he general rule is that a disclosure is 'public' if it is generally available to the public").  Moreover, these disclosures occurred in a manner explicitly detailed by the FCA, which identifies "congressional . . . or other Federal report or hearing" and "news media" as methods of public disclosure.  31 U.S.C. § 3730(e)(4)(A)(ii), (iii).

Plaintiff-relators do not dispute the existence of these prior disclosures.  Rather, they argue that, although the media reported widely that CVS had unlawfully failed to charge the government the same price offered to its HSP customers, the media and congressional reports do not amount to a public disclosure because the reports do not explicitly mention violations of all of the specific health care programs that are the subject of this action.  D. 67 at 12-14; see D. 29 ¶ 3 (alleging that CVS "charged the plaintiff governments substantially more for . . . generic prescription drugs in the Medicaid and Medicare Part D programs" than its usual and customary prices and, therefore, CVS "wrongfully overcharg[ed] the plaintiff governments in violation of the false claims acts").    Specifically, Plaintiff-relators argue that because the news articles and reports do not explicitly discuss Medicare Part D and each state's Medicaid laws there has not been a public disclosure of the alleged fraud.  Id.

As noted above, however, the public disclosure bar applies to *qui tam* actions that are based on allegations "substantially the same" as the publicly disclosed allegations.  31 U.S.C. § 3730(e)(4)(A); see United States ex rel. O'Keeffe v. Sverdrup Corp., 131 F. Supp. 2d 87, 96 (D. Mass. 2001) (noting that "[w]hile [the public disclosure] is not identical to Relator's allegation, it is substantially similar to it and gave the government the heads up . . . .").  Contrary

to Plaintiff-relators' argument, then, a prior, public disclosure need not contain every fact or possible legal consequence to trigger the public disclosure bar.  See Poteet, 619 F.3d at 115 (applying the public disclosure bar even where the complaint identified a specific element of fraud and provided greater detail, noting that "[a]lthough these details undoubtedly add some color to the allegation, the allegation ultimately targets the same fraudulent scheme"); see Dingle v. Bioport Corp., 388 F.3d 209, 215 (6th Cir. 2004) (analogizing relators' suit to one where "multiple general allegations of fraud by public sources with respect to [a] car" have been disclosed but relators seek to bring "a more specific claim of fraud . . . with respect to the engine of the car" and noting that "[a]llowing such a suit would allow potential *qui tam* plaintiff's [sic] to avoid the public disclosure bar by pleading their complaints with more and more detailed factual allegations slightly different from more general allegations already publicly disclosed")). Notably, even Plaintiff-relators do not appear to contest that their allegations are "substantially similar" to the public disclosures. D. 67 at 15 (quoting Ondis, 587 F.3d at 57).  Nor should they, as "identification of one specific legal consequence of the alleged fraud – the possible submission of false claims to Medicare and Medicaid – does not change the substantially similar nature of the underlying allegations of fraud."  United States ex rel. Feldstein v. Organon, Inc., 364 F. App'x 738, 742 (3d Cir. 2010) (citing United States ex rel. Findley v. FPC-Boron Employees' Club, 105 F.3d 675, 688 (D.C. Cir. 1997) (concluding that relator's argument that "his claim survives because the public disclosures do not allege violations of the particular federal statutes listed in his complaint is without merit" and noting that "[a] relator's ability to recognize the legal consequences of a publicly disclosed fraudulent transaction does not alter the fact that the material elements of the violation already have been publicly disclosed")); see A-1 Ambulance Serv., Inc. v. California, 202 F.3d 1238, 1245 (9th Cir. 2000) (noting that "[t]he

mere fact that [a relator's] own expertise in the area . . . may have enabled it to formulate its novel legal theory of fraud is irrelevant to the question of whether the material transactions giving rise to the alleged fraud were already disclosed in the public domain in the first place").

"Given that the purpose of the *qui tam* action is to prosecute fraud of which the government is unaware," Dingle, 388 F.3d at 215, "[w]hen the material elements of a fraud are already in the public domain, the government has no need for a relator to bring the matter to its attention." Ondis, 587 F.3d at 58. To fulfill the intention of Congress then, "the FCA should reward only those who come forward with original, direct, and independent knowledge of a fraud." Id. Here, Plaintiff-relators "merely repeat[] what the public already knows," A-1 Ambulance Serv., Inc., 202 F.3d at 1245, to argue a different legal theory.

Accordingly, the Court concludes that the allegations in the Plaintiff-relators' complaint are substantially similar to allegations that were publicly disclosed.

### 3.    *Plaintiff-relators Are Not Original Sources*

The FCA provides an exception to the public disclosure bar for relators who qualify as original sources of information. Relevant here, the statute defines an "original source" as "an individual . . . who has knowledge that is [1] independent of and [2] materially adds to the publicly disclosed allegations or transactions . . . ." 31 U.S.C. § 3730(e)(4)(B). To be "independent," knowledge must not "depend on the public disclosure or . . . merely constitute[] a use of an individual's unique expertise or training to conclude that the material elements already in the public domain constitute a false claim." Estate of Cunningham, 713 F.3d at 673 (citation omitted) (internal quotation marks omitted). "A relator 'materially adds' to the prior public disclosure if he materially contributes anything of import to the public knowledge about the alleged fraud." Hagerty, 2015 WL 1442497, at *15 (citation omitted) (internal quotation marks

omitted); see United States ex rel. Hoggett v. Univ. of Phoenix, No. 10-cv-02478-MCE-KJ, 2014 WL 3689764, at *9 (E.D. Cal. July 24, 2014) (noting that "even 'independent' knowledge of allegedly fraudulent activity does not 'materially add' to publicly disclosed allegations unless it is 'qualitatively different' from information already discovered and not 'merely the product and outgrowth of publicly disclosed information'"), reconsideration denied, No. 2:10-CV-02478-MCE, 2014 WL 6473794 (E.D. Cal. Nov. 18, 2014) (citations omitted).  Plaintiff-relators bear the burden of proving that they are original sources.  See, e.g., Estate of Cunningham, 713 F.3d at 673.

Here, Plaintiff-relators argue that they are "independent" and that they "materially add" to the publicly disclosed information because they provide detail on how the scheme was carried out, adding important evidence of scienter.  D. 67 at 16, 18-19.  Specifically, Plaintiff-relators argue that relator Martinsen "saw first-hand how CVS implemented it HSP program" and that during an audit, relator Winkelman "observed that CVS' [usual and customary] prices were higher than the HSP prices."  D. 67 at 17-18.  As discussed above in detail, however, Plaintiff-relators' allegations largely mirror the prior, publicly disclosed information.  See, e.g., D. 61-3 at 2, "Change to Win Study Shows Drug Manager CVS Caremark Charges More for Generic Drugs to Federal Employees and US Government than Walk-in Customers," Bloomberg (February 3, 2010) (reporting "that pharmacy benefits manager CVS Caremark charges its largest customer – the US government – and millions of federal employees more for hundreds of generic drugs than participants in its retail generics discount program"); D. 61-12 at 2, "Connecticut, CVS in Dispute Over Discount Program," Associated Press (June 23, 2010) (reporting on CVS's "threat" to end the discount program in the state and noting that state law "requires pharmacies to charge

Medicaid the lowest drug price offered to consumers and links those prices to savings and discount programs such as the CVS Health Savings Pass program").

Plaintiff-relators rely upon United States ex rel. Duxbury v. Ortho Biotech Products, L.P., 579 F.3d 13, 25 (1st Cir. 2009) for the proposition "that situations can arise where the information upon which the public disclosure is based may be unavailable (such as a reporter protecting a source) or be of little value (if based on rumors), while a relator may have different information of the publicly disclosed fraud (such as eyewitness testimony, documents, etc.) of great significance."  D. 67 at 16 (quoting Duxbury, 579 F.3d at 25).[7]  But the information provided by Plaintiff-relators was neither unavailable nor "of great significance" beyond what was publicly disclosed.   Although Plaintiff-relators rely heavily on their "first-hand observations" of how the HSP program worked and that CVS did not treat HSP prices as usual and customary prices, see, e.g., D. 67 at 17-18, the fact that CVS was not charging the government HSP prices, and thus, was not treating HSP prices as usual and customary prices had already been publicly reported.  Cf. Hagerty, 2015 WL 1442497, at *16 (concluding that a relator's knowledge "materially adds" to the public disclosure when the fraud that was alleged in the prior public disclosures was fraud on doctors and patients, but where fraud on the

---

[7] Plaintiff-relators also rely upon two Seventh Circuit cases, United States ex rel. Lamers v. City of Green Bay, 168 F.3d 1013 (7th Cir. 1999) and United States ex rel. Baltazar v. Warden, 635 F.3d 866 (7th Cir. 2011), to argue that they qualify as "original sources."  D. 67 at 16.  To begin, the Court notes that Lamers was decided prior to the 2010 amendment, which replaced the "direct" knowledge requirement with "materially adds" language.  See Pub. L. No. 111-148, § 10104(j)(2).  Moreover, the Lamers court focused not on whether the relator's allegations materially added to the public disclosure, but on whether the relator could be deemed to possess "independent knowledge" even though he was not a traditional insider.  Lamers, 168 F.3d at 1017.  Further in Baltazar, the court did not reach the "original source" issue at all.  Rather, the Baltazar court focused on whether a public report documenting aggregate statistics of false claims within an industry as a whole amounted to public disclosure and concluded that the relator's allegations were not "based on" the disclosures, noting that "[a] statement such as 'half of all chiropractors' claims are bogus' does not reveal which half and therefore does not permit suit against any particular medical provider."  Baltazar, 635 F.3d at 867-69.

government had not been alleged, noting that "[w]ithout relator's new information, there is no basis for an FCA claim").  Contrary to Plaintiff-relators argument, then, it is unclear to the Court how the proffered details "about how CVS administered the [HSP] program," D. 67 at 19, provide "qualitatively different . . . information [from that] already discovered" concerning the nature of the alleged fraud.  <u>Hoggett</u>, 2014 WL 3689764, at *9 (internal quotation marks omitted).

For the reasons explained above, the Court concludes that the public disclosure provision of the FCA bars this action.

**B.      <u>CVS's Remaining Arguments</u>**

CVS has raised a number of other arguments for dismissal of this action for failure to state a claim.  <u>See, e.g.</u>, D. 60 at 18-25.  Because the Court has determined that the public disclosure bar requires dismissal of this action, however, the Court need not reach CVS's remaining arguments.

**VI.     Conclusion**

For the foregoing reasons, the Court ALLOWS Defendants' motion to dismiss, D. 59.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge
